Andrew Hursh
ADVOCATES FOR THE WEST
117 W. Broadway
Missoula, MT 59802
(208) 268-5210
ahursh@advocateswest.org

Sarah Stellberg
Margaret Parker
ADVOCATES FOR THE WEST
P.O. Box 1610
Boise, ID 83701
(208) 342-7024
sstellberg@advocateswest.org
mparker@advocateswest.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, GALLATIN WILDLIFE ASSOCIATION, GREAT OLD BROADS FOR WILDERNESS, ROCKY MOUNTAIN WILD, SIERRA CLUB, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS, <br><br> Plaintiffs, <br><br> vs. <br><br> SONYA GERMANN, in her official capacity as Montana-Dakotas State Director, Bureau of Land Management; JOSEPH STOUT, in his official capacity as California State Director, Bureau of Land | Case No. CV-26-21-GF-JTJ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Management; MEAGAN CONRY, in her
official capacity as Acting Idaho State
Director, Bureau of Land Management;
JON K. RABY, in his official capacity as
Nevada State Director, Bureau of Land
Management; TOM HEINLEIN, in his
official capacity as Acting Utah State
Director, Bureau of Land Management;
KRISTINA KIRBY, in her official capacity
as Acting Wyoming State Director, Bureau
of Land Management; BILL GROFFY, in
his official capacity as Principal Deputy
Director, Bureau of Land Management;
BUREAU OF LAND MANAGEMENT,

    Defendants.

## **INTRODUCTION**

1.    This suit challenges the U.S. Bureau of Land Management's ("BLM")

2025 Records of Decision ("RODs") approving Resource Management Plan

Amendments for greater sage-grouse in Montana, California, Colorado, Idaho,

Nevada, North Dakota, South Dakota, Utah, and Wyoming ("2025 Plans").

Collectively, these 2025 Plans govern management of greater sage-grouse habitat

across 71 million acres of BLM-managed lands.

2.    The greater sage-grouse is a ground-dwelling bird dependent on the

sagebrush steppe ecosystem. Once abundant across the American West, the species

is declining toward extinction due to loss, fragmentation, and degradation of vast

areas of its native habitat. Because it requires large and interconnected expanses of

sagebrush for survival, the greater sage-grouse is also considered an "umbrella species," meaning that protecting it benefits some 350 other wildlife species also dependent on healthy sagebrush ecosystems.

3.      In 2010, the U.S. Fish and Wildlife Service ("Service") found that greater sage-grouse was in sufficient danger of extinction to warrant Endangered Species Act ("ESA") listing. This finding rested heavily on the inadequacy of regulatory protections from the BLM and U.S. Forest Service ("Forest Service"), who manage over half of the bird's remaining habitat. To avoid the constraints of an ESA listing, the BLM and Forest Service responded by amending 98 of their land use plans across the sage-grouse range in 2015 to better protect its habitat from threats like oil and gas drilling, mining, and grazing.

4.      Those 2015 Plans prompted the Service to find, in October 2015, that adequate regulatory mechanisms existed to protect the greater sage-grouse such that ESA listing was no longer warranted.

5.      However, soon after securing that "not warranted" finding, BLM under the first Trump Administration attempted to dismantle the 2015 Plans. It began with interim guidance purporting to "reinterpret" and weaken 2015 Plan measures, such as the requirement that BLM prioritize oil and gas leasing outside of sage-grouse habitat. This Court vacated that prioritization guidance as unlawful, and the Ninth Circuit affirmed. *See Mont. Wildlife Fed'n v. Bernhardt*, No. 18-cv-

069-BMM, 2020 WL 2615631 (D. Mont. May 20, 2020), *aff'd sub nom. Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025). In 2019, BLM then formally amended the 2015 Plans in all states but Montana to remove limits on drilling, mining, and other developments in sage-grouse habitat. Those amendments were immediately enjoined. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019).

6.    Meanwhile, despite a decade of management under the 2015 Plans, the greater sage-grouse is still in decline. Populations have dropped nearly 80 percent since 1966, with over half of that loss occurring in the last two decades alone. The bird's habitat is also still disappearing at an alarming rate: 1.3 million acres per year. And as a forewarning for the remaining range, North Dakota's sage-grouse population now appears to be effectively extinct.

7.    Despite these continued downward trends, the 2025 Plans attempt again to *weaken* BLM's land use plan protections for sage-grouse—carrying forward many of the rollbacks from the 2019 Plans. Gone are essential pillars of the 2015 Plans, such as prioritization of oil and gas leasing outside sage-grouse habitat, a mineral withdrawal and non-waivable development prohibitions for crucial habitat, and compensatory mitigation to offset any new habitat losses. These changes lack any scientific basis and will inexorably accelerate the sage-grouse's downward spiral toward extinction.

COMPLAINT - 4

8.      The 2025 Plans are also unlawful on numerous grounds. First, BLM violated its core Administrative Procedure Act ("APA") duty to engage in reasoned decisionmaking. It failed to explain key departures from its 2015 Plans and the science on which they were predicated, or to grapple with the important reliance interests engendered in the Service's "Not Warranted" ESA finding. BLM also failed to consider an essential question: the degree to which its 2025 Plans will ensure survival and recovery of the greater sage-grouse—a striking omission, as this was their guiding purpose. BLM also failed to reasonably explain vast discrepancies among its state plans, which heed political pressures but not science or BLM's stated goal of "consistent conservation across state lines."

9.      Second, BLM violated its essential substantive duties under the Federal Land Policy and Management Act ("FLPMA"), which together set out a clear principle: that BLM must manage public lands to sustain their wildlife species. These include BLM's duties to manage public lands to ensure "sustained yield" of their wildlife resources; to avoid "permanent impairment" to the quality of the environment; and "to take any action required to prevent unnecessary or undue degradation" of public land resources. BLM further violated FLPMA by failing to prioritize the designation and protection of Areas of Critical Environmental Concern ("ACECs") or ensure consistency with the Forest Service's stronger land use protections for sage-grouse.

COMPLAINT - 5

10.    Third, BLM violated the National Environmental Policy Act ("NEPA") by failing to adequately study the effects of its 2025 Plans. BLM issued all six RODs based on a single 2024 Final Environmental Impact Statement ("FEIS") that it never updated after making self-described "significant changes" to its proposed plans. The FEIS also failed to take the requisite hard look at impacts to sage-grouse, resting on cursory and incomplete analysis of how the species will fare under weaker land use protections. As a result, the FEIS did not serve its essential function of fostering accountability and informed decisionmaking, violating NEPA.

11.    Accordingly, Plaintiffs ask this Court to hold unlawful and vacate the RODs, 2025 Plans, and FEIS. Plaintiffs also seek such injunctive relief as may be necessary to preserve the status quo, remedy these violations, and avoid irreparable harm to Plaintiffs' interests, the environment, and the greater sage-grouse.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the case involves questions of federal law.

13.    An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 701–06.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendant Sonya Germann resides in Montana, and a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. Additionally, Plaintiff Gallatin Wildlife Association is based in Montana; Plaintiff Great Old Broads for Wilderness is incorporated in Montana; Plaintiffs Sierra Club and Great Old Broads for Wilderness each have a Montana Chapter located in Montana; and Plaintiffs Center for Biological Diversity, Western Watersheds Project, WildEarth Guardians have offices in this district.

15.    This case is properly filed in the Great Falls Division of this Court because a substantial part of the public lands and Resource Management Plans at issue are located in this division. Specifically, five of the seven BLM Montana Resource Management Plans amended by the challenged RODs overlap with Blaine, Chouteau, Fergus, Hill, Phillips, Roosevelt, and Valley counties, within the Great Falls Division.

16.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

17.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center is based in Tucson,

Arizona, with offices throughout the country, including Montana. The Center has more than 101,000 members, including many who reside in, explore, and enjoy the native species and ecosystems of the Interior Mountain West, where the greater sage-grouse is found.  The Center has an organizational interest in Defendants' management of habitat for imperiled species on the public lands, and it has participated extensively in prior sage-grouse planning and litigation.

18.    Plaintiff GALLATIN WILDLIFE ASSOCIATION ("GWA") is a nonprofit, all volunteer wildlife conservation organization based in Bozeman, Montana. It has over 250 members and supporters who are residents of the state of Montana. The organization is dedicated to the preservation and restoration of wildlife, fisheries, habitat, and migration corridors in Southwest Montana using science-based decision making. GWA was founded in 1976 and recognizes the intense pressures on wildlife from habitat loss and climate change. GWA has a history of advocacy for greater sage-grouse conservation and habitat in Montana.

19.    Plaintiff GREAT OLD BROADS FOR WILDERNESS ("Broads") is a national grassroots organization, led by women, that engages and inspires activism to preserve and protect wilderness and wild lands. Conceived by older women who love wilderness, Great Old Broads for Wilderness gives voice to the millions of Americans who want to protect their public lands as Wilderness for this and future generations. Their work includes hands-on stewardship projects,

education, and advocacy for protection of wildlife and wild places. Great Old

Broads for Wilderness has over 10,000 members and supporters, including a

Montana Broadband chapter that conducts stewardship projects and advocate for

the protection of public lands and wildlife in Montana.

20.    Plaintiff ROCKY MOUNTAIN WILD ("RMW") is a nonprofit

dedicated to ensuring the long-term survival and recovery of wildlife populations

and wildlands in the Southern Rocky Mountain region of Colorado, southern

Wyoming, eastern Utah, and northern New Mexico. The organization has a long

history of participating in BLM land use decisions and working to protect and

restore native species, including greater sage-grouse. Its members and supporters

include approximately 5,000 outdoor enthusiasts, wildlife conservationists,

scientists, and concerned citizens across the country.

21.    Plaintiff SIERRA CLUB is a national nonprofit organization of more

than 614,000 members dedicated to exploring, enjoying, and protecting the wild

places of the earth; to practicing and promoting the responsible use of the earth's

ecosystems and resources; to educating and enlisting humanity to protect and

restore the quality of the natural and human environment; and to using all lawful

means to carry out these objectives. Sierra Club and its members have a

longstanding interest in protection of the greater sage-grouse and other wildlife,

ecosystems, and recreational opportunities on federal public lands. The Montana

Chapter of the Sierra Club has approximately 2,400 members.

22.    Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a

nonprofit membership organization founded in 1993 with the mission of protecting

and restoring western watersheds and wildlife through education, public policy

initiatives, and litigation. Headquartered in Hailey, Idaho, Western Watersheds

Project has staff and offices in Montana, Oregon, California, Arizona, and

Wyoming. It has more than 50,000 members and supporters, including those who

live, work, and recreate in lands that will be harmed by the 2025 Plans. WWP has

long-standing interests in preserving and conserving greater sage-grouse

populations and habitat across the species' range.

23.    Plaintiff WILDEARTH GUARDIANS ("Guardians") is a nonprofit

conservation organization dedicated to protecting and restoring the wildlife, wild

places, wild rivers, and health of the American West. Guardians' Sagebrush Sea

Campaign focuses on the conservation of sagebrush landscapes and sage-grouse

populations around the West. Guardians has an office in Missoula, Montana, and it

has over 210,000 members and supporters nationwide, many of whom have deep

interest in conserving greater sage-grouse populations and habitats, particularly on

public lands.

COMPLAINT - 10

24.     Plaintiffs have exhausted all available administrative remedies and issues raised in this complaint to the extent required by law, including by submitting written comments and protests to BLM during the planning process.

25.     Plaintiffs' members and staff live, work, visit, and recreate in lands affected by BLM's 2025 Plans in Montana, California, Colorado, the Dakotas, Idaho, Nevada, Utah, and Wyoming. They regularly use these areas for a variety of recreational and vocational purposes, including hiking, camping, fishing, hunting, photography, aesthetic enjoyment, solitude, spiritual contemplation, and scientific study. Plaintiffs' members intend to continue doing so for the foreseeable future. Plaintiffs' members also enjoy observing, or attempting to observe, greater sage-grouse and signs of their presence, in these areas.

26.     As a result of the 2025 Plans, members' use and enjoyment of these areas will be diminished. The 2025 Plans will make existing uses of the affected lands, such as from grazing, more harmful on the landscape and wildlife, and will result in more habitat-disturbing activities being approved on BLM-managed lands. This harms Plaintiffs' members aesthetic and recreational interests in observing and recreating on healthy, intact landscapes. The 2025 Plans will also degrade wildlife habitat, making it harder for Plaintiffs' members to see wildlife, including sage-grouse, while on the affected lands.

COMPLAINT - 11

27.    Livestock grazing under the 2025 Plans will be more harmful to Plaintiffs' members. For example, the 2025 Plans no longer require BLM to prioritize field checks for grazing permit compliance in sage-grouse habitat. They also add new preconditions to interventions in grazing management: first, sage-grouse populations must decline past defined thresholds; second, a formal Causal Factor Analysis must identify grazing as the cause of the declines; and third, the permit must then come up for renewal through "full processing," as opposed to the more common automatic renewal. Grass height standards were also changed for Idaho, Wyoming, Nevada, and California under the 2025 Plans from a quantitative height to a highly subjective "suitable nesting cover" recommendation. These changes will significantly delay intervention in grazing management, increase ecosystem degradation, harm sage-grouse, and diminish members' enjoyment of recreation on grazing allotments, including their ability to view sage-grouse.

28.    Plaintiffs' members and staff recreate on BLM grazing allotments that will be subject to the 2025 Plans in every affected state. One of Plaintiffs' members who lives in Montana recreates on BLM's Fish Creek, Carpenter Creek, Telegraph Creek, Oxbow, and Rio Puerco grazing allotments, among numerous others affected by the 2025 Plans. Another of Plaintiffs' members who lives in Nevada enjoys recreating in sage-grouse habitat near the Nevada-California border on BLM's Board Corral, Massacre Lakes, Massacre Mountain, Nevada Cowhead,

Nevada Coleman, and Home Camp allotments, among numerous others affected by the 2025 Plans. The increased grazing degradation under the 2025 Plans will injure the recreational use and enjoyment of these and other Plaintiff members, including their ability to observe sage-grouse.

29.    Oil and gas leasing implemented under the 2025 Plans will also be more harmful to Plaintiffs' members, including because the Plans eliminate the requirement that BLM prioritize new oil and gas leasing outside sage-grouse habitat. The 2025 Plans also dropped the proposal to designate 4,213,000 acres of "PHMA with limited exceptions," in which oil and gas development would be prohibited without exception. This harms Plaintiffs' members who recreate in sage-grouse habitat that was previously less likely to be auctioned for development because of the prioritization requirement or would have been protected completely by the "PHMA with limited exceptions" designation, as these areas now face a substantially greater risk of oil and gas development. Oil and gas development in these areas would decrease Plaintiffs' members use and enjoyment of them and harm members' ability to observe and photograph sage-grouse.

30.    The changes in the 2025 Plans also harm Plaintiffs' members who recreate on lands where new oil and gas leases will be auctioned under the 2025 Plans, or that have already been leased, because any BLM drilling permits issued to those leaseholders will be subject to less stringent requirements. Many of

Plaintiffs' members use, for recreation and other purposes, specific parcels of land that are proposed to be auctioned off during BLM's 2026 lease sales. One of Plaintiffs' members uses several dozen parcels in sage-grouse habitat that are proposed to be auctioned during Wyoming's Third Quarter and Colorado's Second Quarter lease sale. His and other members' aesthetic, conservation, recreational, and wildlife preservation interests will be harmed by oil and gas development in these areas, and other areas proposed for new lease sales.

31.     The 2025 Plans also harm Plaintiffs' members by eliminating the requirement that BLM propose a mineral withdrawal for 10 million acres of Sagebrush Focal Area ("SFA") habitat. Removing the SFA mineral withdrawal proposal increases the risk of mining disturbance on lands that Plaintiffs' members enjoy using for recreational, spiritual, vocational, and other purposes. Plaintiffs' members recreate on SFA habitat that was part of the proposed withdrawal in every affected state. For example, one member grew up in Southern Idaho and makes frequent trips with family to BLM lands south of Twin Falls to camp, hike, bird, and explore. Portions of this area that he's visited hundreds of times and plans to continue visiting were high quality sage-grouse habitat designated as SFA that would have benefitted from the withdrawal. The aesthetic and noise disturbances from mining there would harm his and other Plaintiffs' members recreational interests in these areas and decrease his use and enjoyment of these areas on future

visits. Mining disturbance would also diminish members' ability to observe and photograph greater sage-grouse while recreating in SFA habitat.

32.    The 2025 Plans also harm Plaintiffs' members by failing to prioritize the designation and protection of 14 potential ACECs, comprising areas of particular conservation significance to sage-grouse. Plaintiffs' members recreate in areas of Montana, Wyoming, Idaho, Nevada, Utah, and Colorado that BLM improperly deprived of ACEC designations in the planning process. One of Plaintiffs' members regularly enjoys camping and hiking in the South Valley Phillips potential ACEC in Montana. The 2025 Plans will harm him and other of Plaintiffs' members because these areas will not be given increased protections from intrusive development, which in turn will diminish members' use and enjoyment of these lands while also making it harder for members to observe wildlife, including sage-grouse, in these areas.

33.    The 2025 Plans also harm Plaintiffs' members by removing areas of Priority Habitat Management Areas ("PHMA") and General Habitat Management Areas ("GHMA") designated under the 2015 Plans, where Plaintiffs' members enjoy observing, or looking for signs of, sage-grouse. One of Plaintiffs' members who lives in Utah enjoys visiting the Parker Mountain, Sheeprock, and Rich-Morgan sage-grouse populations for personal enjoyment, for field work and to lead guided trips with conservation students. GHMA on the southern portion of the

Rich-Morgan population habitat, PHMA and GHMA from the northern portion of the Sheeprock population, and PHMA and GHMA from the northern portion of the Parker Mountain population's habitat are all de-designated under the 2025 Plans. This de-designation will eliminate protections for sage-grouse in these areas, making it harder for her and other of Plaintiffs' members to view sage-grouse when visiting these areas of Utah in the future.

34.    The requested relief would redress these actual, concrete injuries to Plaintiffs' members caused by Defendants' failure to comply with duties mandated by FLPMA, NEPA, the APA, and their implementing regulations.

35.    Apart from this action, Plaintiffs have no adequate remedy at law.

36.    Defendant SONYA GERMANN is the BLM Montana-Dakotas State Director and signed the December 2025 Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Montana, challenged herein ("Montana ROD"). She is sued solely in her official capacity.

37.    Defendant MEAGAN CONRY is the BLM Idaho State Director and her predecessor in office signed the December 2025 Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Idaho, challenged herein ("Idaho ROD"). She is sued solely in her official capacity.

38.     Defendant JON RABY is the BLM Nevada State Director, and Defendant JOSEPH STOUT is the BLM California State Director. Together, they signed the December 2025 Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Nevada and Northeastern California, challenged herein ("Nevada/California ROD"). They are sued solely in their official capacity.

39.     Defendant TOM HEINLEIN is the BLM Utah State Director. His predecessor in office signed the December 2025 Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Utah, challenged herein ("Utah ROD"). He is sued solely in his official capacity.

40.     Defendant KRISTINA KIRBY is the BLM Wyoming State Director and signed the December 2025 Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Wyoming, challenged herein ("Wyoming ROD"). She is sued solely in her official capacity.

41.     Defendant BILL GROFFY is BLM's Principal Deputy Director. His predecessor in office signed the January 2025 Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendments for Colorado, challenged herein ("Colorado ROD"). He is sued solely in his official capacity.

42.    Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, within the Department of Interior. BLM is charged with managing public lands and minerals in accordance with federal law. BLM issued the decisions challenged here.

43.    All Defendants are jointly referred to as "BLM" herein.

## LEGAL BACKGROUND

### A.    Federal Land Policy and Management Act ("FLPMA")

44.    Enacted in 1976, FLPMA establishes basic legal mandates governing BLM's management of the public lands. 43 U.S.C. § 1701 *et seq.*

45.    In FLPMA, Congress directed that,

[P]ublic lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

46.    FLPMA also identifies "fish and wildlife development and utilization" as one of six "principal or major uses" of public lands. *Id.* § 1702(l).

47.    FLPMA provides that BLM public lands "shall" be managed "for multiple use and sustained yield." *Id.* § 1732(a).

48.    Congress defined the term "multiple use" as:

[M]anagement of the public lands and their various resource values so that
they are utilized in the combination that will best meet the present and future
needs of the American people; . . . the use of some land for less than all of
the resources; a combination of balanced and diverse resource uses that takes
into account the *long-term needs of future generations for* renewable and
nonrenewable resources, including, but not limited to, recreation, range,
timber, minerals, watershed, *wildlife and fish*, and natural scenic, scientific
and historical values; and harmonious and coordinated management of the
various resources *without permanent impairment of* the productivity of the
land and *the quality of the environment* with consideration being given to the
relative values of the resources and not necessarily to the combination of
uses that will give the greatest economic return or the greatest unit output.

*Id*. § 1702(c) (emphasis added).

49.    Congress defined the term "sustained yield" as "the achievement and

maintenance in perpetuity of a high-level annual or regular periodic output of the

various renewable resources of the public lands consistent with multiple use." *Id.*

§ 1702(h). The statute lists wildlife as one such renewable resource. *Id*. § 1702(c).

50.    The prohibition on "permanent impairment" of the environment in

FLPMA's definition of multiple-use is unique and purposeful. Instead of using the

definition of multiple-use from the Multiple-Use Sustained-Yield Act, as it did in

enacting the National Forest Management Act, Congress chose to weave this

additional environmental protection mandate into FLPMA's multiple-use

provisions. *See* H. R. Rep. No. 94-583, 94th Cong.1st Sess. (Dec. 18, 1975).

51.     FLPMA further mandates that the Secretary of Interior "shall" take any action necessary to prevent "unnecessary or undue degradation" of public lands. *Id.* § 1732(b).

52.     Land use planning occupies a central place in FLPMA's statutory scheme for public land resources. FLPMA directs the Secretary of Interior to develop and regularly update land use plans (called "Resource Management Plans" or "RMPs") to establish the goals, allowable uses, resource protections, and other requirements for lands under Interior's control. 43 U.S.C. §§ 1712(a), 1732(a); *see also* 43 C.F.R. Part 1600 (land use planning regulations). All subsequent actions must adhere to the approved plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

53.     FLPMA Section 202(c) enumerates the statutory criteria which BLM must consider in the development and revision of land use plans:

(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;
(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;
(3) give priority to the designation and protection of areas of critical environmental concern;
. . .
(5) consider present and potential uses of the public lands;
(6) consider the relative scarcity of the values involved and the availability of alternative means . . . and sites for realization of those values;
(7) weigh long-term benefits to the public against short-term benefits; [and]
. . .
(9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning

and management programs of other Federal departments and agencies and of the States[.]

43 U.S.C. § 1712(c).

54.    One such requirement is for BLM to "coordinate" its land use plans with those of states and of other Federal agencies. *Id.* § 1712(c)(9). BLM's land use planning regulations further require that plans "shall be consistent with officially approved or adopted resource related plans . . . of other Federal agencies, State and local governments and Indian tribes, so long as the guidance and resource management plans are also consistent with the purposes, policies and programs of Federal laws and regulations applicable to public lands." 43 C.F.R. § 1610.3-2.

55.    Additionally, BLM State Directors must provide guidance to field staff on planning decisions, must ensure such guidance "is as consistent as possible with existing officially adopted and approved resource related plans . . . of other Federal agencies," must "[i]dentify areas where the proposed guidance is inconsistent with such policies, plans or programs and provide reasons why the inconsistencies exist and cannot be remedied," and must  "[n]otify the other Federal agencies . . . with whom consistency is not achieved and indicate any appropriate methods, procedures, actions and/or programs which the State Director believes may lead to resolution of such inconsistencies." *Id.* 1610.3-1(d).

56.    FLPMA Section 202(c) also requires that in developing and amending land use plans, the Secretary of Interior "shall . . . give priority to the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c)(3).

57.    FLPMA defines areas of critical environmental concern ("ACECs") as "areas within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." *Id.* § 1702(a).

58.    Other FLPMA provisions reflect this same Congressional directive that BLM give priority to ACECs in the planning and administration of the public lands. *See id.* § 1701(11) (FLPMA statement of policy requiring "regulations and plans for the protection of public land areas of critical environmental concern be promptly developed"); *id.* § 1711(a) (requiring that the Secretary "shall prepare and maintain . . . an inventory of public lands and their resources and other values . . . giving priority to areas of critical environmental concern").

59.    BLM's planning regulations provide that "identification, evaluation, and priority management of ACECs shall be considered during the development

and revision of resource management plans and during amendments to resource management plans." 43 C.F.R. § 1610.7-2(b).[1]

60.    Once areas to be considered as ACECs have been identified, BLM must determine whether the proposed ACEC possesses "relevance" and "importance" to qualify as an ACEC. *See* 43 C.F.R. § 1610.7-2(d)(1), (2).

61.    "Relevance" means that "the area contains important historic, cultural, or scenic values; fish or wildlife resources; natural systems or processes; or natural hazards potentially impacting life and safety." 43 C.F.R. § 1610.7-2(d)(1).

62.    "Importance" means that "it has qualities of special worth, consequence, meaning, distinctiveness, or cause for concern; national or more than local importance, subsistence value, or regional contribution of a resource, value, system, or process; or contributes to ecosystem resilience, landscape intactness, or habitat connectivity." *Id.* § 1610.7-2(d)(2).

63.    If BLM determines that an area meets the "relevance" and "importance" criteria, then its designation as an ACEC must be analyzed "in detail" during the RMP amendment process. *Id.* § 1610.7-2(g).

64.    Designation as an ACEC is then based on whether or not the area requires "special management attention," which means "management prescriptions

---

[1] Citations are to the ACEC regulations adopted on May 9, 2024, *see* 89 Fed. Reg. 40,337, that were in effect at the time the RODs were signed.

that (i) Protect and prevent irreparable damage to the relevant and important values

. . . ; and (ii) would not be prescribed if the relevant and important values were not

present." *Id.* § 1610.7-2(d)(3).

66. The decision document for a Resource Management Plan "shall . . .

provide a justification and rationale for both ACEC designation decisions and

decisions not to designate a proposed ACEC." 43 C.F.R. § 1610.7-2(j)(2).

66. The BLM "State Director shall . . . [d]etermine which ACECs to

designate based on:

(i)     The presumption that all areas found to require special management
        attention will be designated;
(ii)    The value of other resource uses in the area;
(iii)   The feasibility of managing the designation; and
(iv)    The relationship to other types of designations and protective
        management available.

43 C.F.R. § 1610.7-2(j)(1).

67. The RMP must identify special management prescriptions for each

designated ACEC. 43 C.F.R. § 1610.7-2(h).

68. Designated ACECs must be managed "in a manner that conserves,

protects, and enhances the relevant and important values," and only allowing uses

that "will ensure the protection of the relevant and important values." 43 C.F.R.

§ 1610.7-2(j)(3); *see also id.* § 1610.7-2(a).

COMPLAINT - 24

**B.     BLM Special Status Species Manual**

69.     Pursuant to FLPMA, the ESA, and other authority, BLM has adopted a manual on "Special Status Species Management," published in BLM Manual Section (MS) 6840 (hereafter "Special Status Species Manual").

70.     "Special status species" subject to the Manual include species that are: (1) federally listed, proposed, or candidates for listing under the ESA; (2) recently delisted; and (3) BLM sensitive species.

71.     The greater sage-grouse is a BLM-designated "sensitive species," and thus a special status species subject to the Manual.

72.     The 2024 version of BLM's Special Status Species Manual was in effect during the adoption of the Colorado ROD challenged here. It declares an overarching objective of proactive conservation and recovery for special status species to avoid the need for ESA listing. It further directs BLM, in land use planning, to "[d]evelop plan components to protect, conserve, and recover special status species, habitats, and ecosystem structure and function."

73.     The 2008 version of BLM's Special Status Species Manual was in effect during the adoption of the remaining RODs challenged here. Its stated objective is to "reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA." To achieve this goal, the Manual provides that "[a]ctions authorized by the BLM shall further

the conservation of Bureau sensitive species" and "Bureau sensitive species will be managed . . . to promote their conservation and to minimize the likelihood and need for listing under the ESA." It also charges BLM State Directors with "[c]oordinating the BLM special status species conservation efforts with . . . other Federal agencies" and ensuring that "land use plans . . . identify appropriate outcomes, strategies, restoration opportunities, use restrictions, and management actions necessary to conserve and/or recover listed species . . . [and] Bureau sensitive species."

### C.    National Environmental Policy Act ("NEPA")

74.    Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

75.    NEPA "declares that it is the continuing policy of the Federal Government . . . to use all practicable means and . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a).

76.     Under NEPA, federal agencies must prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must analyze and describe the "reasonably foreseeable environmental effects" of the proposed action, "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented," as well as a "reasonable range of alternatives" that are technically and economically feasible, including a no action alternative. *Id.*

77.     This law is intended to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. *See id*; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

78.     In preparing an EIS, an agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," and "make use of reliable data and resources." 42 U.S.C. § 4332(2)(D)–(E).

79.     BLM has determined that preparation of a resource management plan "is considered a major federal action significantly affecting the quality of the

human environment," and therefore requires the preparation of an EIS under

NEPA. 43 C.F.R. § 1601.0-6.

80.    The Department of Interior's NEPA Handbook provides that if

"substantial changes" are made to the proposed action after a prior EIS has been

circulated, and the changes "are relevant to environmental concerns," a supplement

to the prior EIS "must be prepared."

### D.    Administrative Procedure Act ("APA")

81.    The agency actions challenged here are reviewable under the APA, 5

U.S.C. §§ 702, 704, 706. The APA directs courts to "hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law" or "in excess of

statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(A), (C).

82.    Agency actions must also be set aside if made "without observance of

procedure required by law." *Id.* § 706(2)(D).

83.    The touchstone of arbitrary-and-capricious review is whether an

agency "engage[d] in reasoned decisionmaking." *Dep't of Homeland Sec. v.

Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). Agency action is

arbitrary and capricious "if the agency has relied on factors which Congress has

not intended it to consider"; "entirely failed to consider an important aspect of the

problem"; "offered an explanation for its decision that runs counter to the evidence

before [it]"; or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

84.    When an agency changes position on a matter, it must also "display awareness that it is changing position" and offer "good reasons" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must provide "a more detailed justification" if the new position "rests upon factual findings that contradict those which underlay its prior policy" or undermines "serious reliance interests." *Id.* Failing to do so renders a decision arbitrary and capricious. *Id.*

## **FACTUAL BACKGROUND**

### **E.    The Plight of the Greater Sage-Grouse.**

85.    The greater sage-grouse (*Centrocercus urophasianusis*) is a large, ground-dwelling bird that once covered the sagebrush steppe of the American West. These iconic birds are known for their elaborate mating dance, where males gather in spring on traditional breeding grounds (known as leks) and strut with their chests puffed and spiky tails spread, hoping to attract females.

86.    As "sagebrush obligates," greater sage-grouse rely on sagebrush for their survival year-round, including for food, cover, and reproduction habitats.

87.    Sage-grouse are also a useful "umbrella species" in that protecting sage-grouse habitat has benefits for more than 350 other sagebrush-dependent

species, such as mule deer, pronghorn, pygmy rabbit, sage sparrow, and other mammals, reptiles, amphibians, plants, and fishes.

88.    These birds are now a rare sight. Some 16 million sage-grouse once ranged across the sagebrush steppe, but scientists estimate that fewer than 200,000 may exist today. Since 1965, sage-grouse populations have declined 80 percent, with half of that loss occurring in the last two decades alone.

89.    A 2025 study from the USGS in partnership with BLM found that sage-grouse populations are still declining at an average rate of 3 percent annually. That same study predicts that two thirds of all sage-grouse leks are likely to be extirpated in the foreseeable future.

90.    North Dakota's sage-grouse population now appears to be effectively extinct. South Dakota's sage-grouse population is also on the brink of extinction, with only 70 males counted on leks statewide in 2025.

91.    The key cause: the bird's habitat is vanishing. Sage-grouse require large and interconnected patches of healthy sagebrush habitat to survive. As a result of factors such as human development, mineral extraction, livestock grazing, climate change, wildfire, and cheatgrass incursion, sage-grouse have lost more than half of their historic range. The roughly 150 million acres of sage-grouse habitat that remain are in increasingly fragmented patches, which compromises the ability of grouse to survive and disperse.

92.     Despite recent conservation efforts, the sagebrush steppe ecosystem is still disappearing at an estimated 1.3 million acres per year.

93.     Habitat fragmentation is itself a significant threat. Sage-grouse require connectivity between seasonal habitats, including leks and nearby nesting areas, wetter summer habitats, and lower-elevation wintering areas. Birds can migrate dozens of miles between their seasonal use areas, and even non-migratory populations can have movements exceeding 6 miles. When human development cuts across a landscape, it can inhibit birds from accessing required habitats.

94.     Fragmentation of sage-grouse habitat also prevents important genetic interchange between populations and prevents birds from dispersing to new habitats after wildfire, draught, or intense winters. The loss of connectivity is thus a strong predictor of long-term population declines.

95.     Greater sage-grouse are highly sensitive to anthropogenic disturbance, such as oil and gas wells, mines, roads, powerlines, and other development. These activities affect sage-grouse in several ways. First, they disturb, degrade, and fragment habitat. This loss is often irreparable, as mature sagebrush stands take decades to reestablish and are easily outcompeted by fast-growing invasives. Potentially greater is the functional habitat loss that occurs as sage-grouse avoid habitat around development sites. Second, human noise and presence disrupt bird behaviors, fitness, and reproduction. Third, human activities cause bird deaths

through collisions—with fences, powerlines, structures, or vehicles—and by providing perches that facilitate avian predation.

96.    Greater sage-grouse exhibit strong fidelity to individual leks and nesting habitats, typically returning to the same sites to breed and nest year after year. This strong site fidelity limits their adaptability to human disturbance, as grouse return to historic grounds even if they can no longer successfully reproduce or survive there. Adult birds remain in disturbed habitat that may have become unsuitable, while yearlings depart from disturbed areas in search of undisturbed habitat. Because sage-grouse tend to self-select habitats that maximize survival and reproductive success, this forced relocation is often to sub-optimal habitat.

97.    Small amounts of development in sage-grouse habitat can negatively affect population viability. Research shows that 99% of active leks across the western half of the sage-grouse range are on lands with 3% or less human development, with the vast majority of birds selecting habitat with disturbance rates in the 0-1% range.

98.    Livestock grazing is the most ubiquitous land use across the sage-grouse range and another significant contributor to the bird's decline. Grazing reduces the height of understory grass below thresholds required by sage-grouse for nesting and concealment. Livestock hooves damage biological soil crusts that otherwise help prevent the establishment of invasive species, like cheatgrass.

Grazing also compacts soils, compromising their ability to retain water and exacerbating drought. Cheatgrass and drought both fuel wildfires in the sagebrush steppe, which then drive further habitat loss. Livestock also compete for many of the same forbs that grouse chicks require in their early life. Fences used to control livestock also provide perches that facilitate avian predation, and low-flying sage-grouse are often killed by collisions with fences.

### F.    ESA Listing History.

99.    In 2005, the U.S. Fish and Wildlife Service responded to ESA listing petitions submitted by Plaintiffs Center for Biological Diversity, Western Watersheds Project, WildEarth Guardians, and others, concluding that listing greater sage-grouse under the ESA was "not warranted" despite the extensive science documenting declining grouse habitats and populations due to many threats. *See* 12-Month Finding For Petitions to List the Greater Sage-Grouse As Threatened Or Endangered, 70 Fed. Reg. 2244–82 (Jan. 12, 2005).

100.   In 2007, a federal court ruled for Plaintiff Western Watersheds Project in a challenge to that "not warranted" finding, reversing the finding due to improper political interference in the listing process, along with the Service's arbitrary treatment of the best available science showing that sage-grouse are deeply imperiled. *See W. Watersheds Project v. U.S. Fish and Wildlife Serv.*, 535 F. Supp. 2d 1173 (D. Idaho 2007).

101.   On remand, the U.S. Fish and Wildlife Service in 2010 announced its finding that ESA listing for greater sage-grouse was "warranted" in light of the decline in sage-grouse populations and increasing threats to its remaining habitats, but determined that proceeding further with a proposed ESA listing rule was "precluded" at that time by limited resources and higher priority species. *See* 12-Month Findings for Petitions to List the Greater Sage-Grouse As Threatened or Endangered, 75 Fed. Reg. 13,910 (March 23, 2010). The Service's "warranted" finding also cited the inadequacy of existing regulatory mechanisms for habitat protection—particularly focusing on BLM and Forest Service land use plans. *Id.*

102.   To resolve litigation challenging that 2010 "warranted, but precluded" determination, the Service agreed to issue a proposed listing rule or "not warranted" finding by the end of fiscal year 2015.

**G.    Greater Sage-Grouse Conservation Planning**

103.   In response to the Service's 2010 "warranted, but precluded" finding and the settlement requiring the Service to reevaluate ESA listing by 2015, BLM and Forest Service launched a National Greater Sage-Grouse Planning Strategy in 2011 to amend federal land use plans across the range of the greater sage-grouse in order to increase protections for sage-grouse and avoid ESA listing.

104.   To advise the planning process, the BLM chartered a National Technical Team ("NTT") of scientific experts from state and federal land and

wildlife agencies to review the best available science and recommend conservation measures for incorporation into the land-use plans. They produced a December 2011 report ("NTT Report"), which emphasized that the overall objective must be to "protect priority sage-grouse habitats from anthropogenic disturbances." The NTT Report identified priority sage-grouse habitats as "breeding, late brood-rearing, winter concentration areas, and where known, migration or connectivity corridors."

105.    The NTT Report recommended closing these habitats to oil and gas or other mineral leasing, concluding that "[t]here is strong evidence . . . that surface-disturbing energy . . . development within priority sage-grouse habitats is not consistent with a goal to maintain or increase populations or distribution." It further found that simply applying buffers around leks "at any distance is unlikely to be effective," and that even a 4-mile buffer "would not be large enough to offset all the impacts reviewed above."

106.    The NTT Report further recommended that priority habitats be "exclusion areas" for new rights-of-way ("ROWs").

107.    Regarding livestock grazing, the NTT Report recommended numerous steps, including that BLM "modify grazing management to meet seasonal sage-grouse habitat requirements," and "maintain residual cover of herbaceous vegetation during nesting."

108.   In subsequent years, a number of scientific studies addressed the conservation thresholds identified in the NTT report. These studies reinforced, rather than refuting or weakening, the recommended levels of habitat protection published in 2011 by the NTT.

109.   In March 2013, the Service released its own expert "Conservation Objectives Team Report" ("COT Report"), which underscored that conservation success will require "achieving a neutral or positive population trend." To meet this goal, the COT Report identified "Priority Areas for Conservation," which it defined as "key habitats necessary for sage-grouse conservation." However, it also recognized the need to protect additional habitats, including for connectivity. In 2014, the Service also identified a subset of the Priority Areas for Conservation as sage-grouse "strongholds," which were the basis for the Sagebrush Focal Areas ("SFAs") designated in the 2015 Plans.

110.   The COT Report similarly recommended prohibiting new energy development, mining, and infrastructure in sage-grouse habitat. Where avoidance of these activities is not possible due to pre-existing rights, the COT Report recommended that development be subject to "an adequate buffer that is sufficient to preclude impacts to sage-grouse habitat from noise, and other human activities."

111.   More broadly, it stressed "an urgent need to 'stop the bleeding' of continued population declines and habitat losses."

H.    **2015 Sage-Grouse Plans.**

112.    In September 2015, after extensive planning and public involvement, the BLM and Forest Service culminated their National Greater Sage-Grouse Planning Strategy by adopting Records of Decision approving amendments to 98 land use plans across the bird's range. BLM and the Forest Service expressly stated that the 2015 Plans followed and applied the best available science concerning sage-grouse habitats and threats.

113.    The 2015 Plans adopted a new tiered sage-grouse habitat designation system with the highest level of protection reserved for the most important habitat. At the top were Sagebrush Focal Areas ("SFAs"), which were sage-grouse "strongholds" that the Service identified based on their high densities of birds, high-quality habitat, and resilience to stressors like wildfire and invasive species. The Service deemed these strongholds "vital to the species persistence," and recommended that the 2015 Plans "institutionalize the highest degree of protection" to "help obtain confidence for long-term sage-grouse persistence." The next highest protection was offered to Priority Habitat Management Areas ("PHMA"), followed by General Habitat Management Areas ("GHMA").

114.    The 2015 Plans included conservation measures drawn in some cases from the NTT and COT Reports, intended to prevent or minimize surface

COMPLAINT - 37

disturbances in these habitats, and adopted weaker protections in other cases. Key features of the 2015 Plans relevant here included the following:

      a.    <u>SFA Protections</u>: BLM's 2015 Plans designated nearly 11.3 million acres as SFAs and offered them additional protections, such as non-waivable "No Surface Occupancy" ("NSO") stipulations to prohibit surface disturbance from oil and gas development; a recommended withdrawal from hard rock mining; and prioritization for grazing permit reviews and post-fire treatments.

      b.    <u>Density and Disturbance Caps</u>: The 2015 Plans in all states but Wyoming established a 3 percent disturbance cap at two spatial scales—the Biologically Significant Unit ("BSU"), a unit containing several interconnected populations, and the project scale. If the 3 percent cap was reached at the project level, the 2015 Plans directed BLM to prohibit further anthropogenic disturbances until disturbance was reduced below the cap. In Wyoming, the cap was set at 5 percent to account for the inclusion of other disturbance types, such as wildfire. A density cap also limited energy and mining facilities to a density of 1 site per 640 acres. These provisions were intended as an important "backstop" to ensure that total disturbance did not exceed levels sage-grouse tolerate.

      c.    <u>Lek Buffers</u>: The 2015 Plans adopted "lek buffers" that prohibited anthropogenic disturbance within certain distances of sage-grouse leks,

so as to protect sage-grouse breeding, nesting, and brood-rearing areas. The distances ranged from 1 to 4 miles around leks, depending on the state and nature of activity—but with much smaller 0.25 and 0.6-mile buffers in Wyoming. BLM derived the buffers from the lower end of ranges recommended in a 2014 paper, Manier et al., USGS, *Conservation Buffer Distance Estimates for Greater Sage-Grouse - A Review* (2014) ("Manier et al. (2014)"). For surface disturbance and energy facilities, Manier et al. (2014) recommended lek buffers of 3.1 to 5 miles, suggesting the larger 5-mile buffer be used absent justifying information. The NTT Report similarly concluded that "[e]ven a 4-mile NSO buffer would not be large enough to offset all the impacts" of energy development.

d. <u>Oil and Gas Restrictions</u>: The 2015 Plans did not follow expert recommendations to close priority habitat to new oil and gas leasing, instead directing BLM to "prioritize" new oil and gas leasing and development outside sage-grouse habitat. The 2015 Plans also imposed surface disturbance restrictions, lek buffers, timing limits, and required design features on oil and gas development, though these were also weaker than the science recommended and subject to waivers, modifications, and exceptions.

e. <u>Mining Restrictions</u>: The 2015 Plans recognized that BLM's ability to sufficiently protect sage-grouse from mining was limited under the 1872 Mining Law. Accordingly, the 2015 Plans recommended a locatable mineral

withdrawal for 10 million acres of SFAs, to ensure at least these habitats were sufficiently protected from mining threats.

f.    Adaptive Management: The 2015 Plans set population and disturbance thresholds that trigger increased protections if sage-grouse habitats or populations fall below the specified levels.

g.    Compensatory Mitigation: The 2015 Plans required all actions resulting in sage-grouse habitat impacts to provide compensatory mitigation—typically off-site habitat improvements—sufficient to ensure a "net conservation gain" to the species.

**I.    2015 "Not Warranted" ESA Finding**

115.    In October 2015, soon after the 2015 Plans were adopted, the U.S. Fish and Wildlife Service issued a finding that adequate regulatory mechanisms existed to protect the sage-grouse such that ESA listing was no longer warranted, resting in significant part on the regulatory mechanisms included in the 2015 Plans. *See* 80 Fed. Reg. 59,858, 59,887 (Oct. 2, 2015).

116.    For example, the Service expressly relied on "more restrictive" and certain protections offered to SFA under the 2015 Plans, which it deemed vital to long-term conservation of the species. These heightened protections included the proposed SFA mineral withdrawal, nonwaivable NSO restriction for oil and gas, and prioritization for livestock grazing permit review and post-fire restoration. *Id.*

COMPLAINT - 40

at 59,878. The Service emphasized that these "are more restrictive" than PHMA measures and thus "more effective at reducing threats within these important areas." *Id.* Of the proposed SFA Mineral Withdrawal, it noted that "the long-term protection of the sage-grouse habitat in the SFAs from locatable mineral development will ensure that these important populations are conserved into the future." *Id.* at 59,857.

117. The Service also expressly relied on the compensatory mitigation requirement, explaining that: "Requiring mitigation for residual impacts provides additional certainty that, while impacts will continue at reduced levels on Federal lands, those impacts will be offset to a net conservation gain standard." *Id.* at 59,881-82.

118. The Service also expressly relied on the 2015 Plans' requirement that "priority will be given to leasing and development of fluid mineral resources, including geothermal, outside of sage-grouse habitat." *Id.* at 59,876. It further expected that PHMA would be either "closed" to new energy development, or subject to "NSO with only very limited exceptions." *Id.* at 59,877.

119. The Service also relied on the 2015 Plan measures to reduce the negative impacts of grazing. It deemed the new monitoring requirements a "major shift" in improving conditions, also noting that mandatory protective measures would be included in permits to protect sage-grouse. *Id.* at 59,910.

COMPLAINT - 41

120.    The Service also relied on the imposition of lek buffers, noting that conservation of these nesting and breeding centers "is crucial to maintaining sage-grouse populations." The Service noted that the 2015 Plans prohibited BLM from approving actions in the lek buffers unless BLM determined that a different buffer distance would provide the same or greater level of protection. *Id.* at 59,880. In GHMA, activities in the lek buffers could also be allowed if the project would cause minor or no new disturbance. *Id.*

121.    Of the entire suite of federal land use plan measures, the Service said: "we expect these conservation efforts will continue to be implemented for the next 20 to 30 years[.]" *Id.* at 59,936.

**J.    2019 Plan Rollbacks**

122.    In 2017, the first Trump Administration came into office and soon began efforts to dismantle the 2015 Plans, in furtherance of the administration's "energy dominance" agenda.

123.    In October 2017, BLM issued a Federal Register notice cancelling consideration of a mineral withdrawal that the 2015 Plans proposed for 10 million acres of sage-grouse SFA habitat, a decision later vacated as arbitrary and capricious. *See W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763 (D. Idaho 2021).

124.    On the same day, it published a Federal Register notice of its intent to amend the 2015 Plans. *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017).

125.    While that planning process was ongoing, BLM then issued interim guidance purporting to "reinterpret" and weaken 2015 Plan measures, such as the requirement that BLM prioritize oil and gas leasing outside of sage-grouse habitat. This Court vacated that prioritization guidance as unlawful, and the Ninth Circuit affirmed. *See Mont. Wildlife Fed'n v. Bernhardt*, No. 18-cv-069-BMM, 2020 WL 2615631 (D. Mont. May 20, 2020), *aff'd sub nom. Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 22, 25–26, 42–47 (9th Cir. 2025).

126.    In March 2019, BLM signed six state-specific Records of Decision approving weakening amendments to the 2015 Plans in seven Western states (California, Colorado, Idaho, Nevada, Oregon, Utah, and Wyoming). These 2019 Plans made numerous fundamental changes to the 2015 Plans, including by:

- eliminating the SFA habitat designation and proposed mineral withdrawal;

- eliminating compensatory mitigation and "net conservation gain" mandates;

- weakening lek buffer requirements;

- weakening disturbance and density caps;

- weakening protections against oil and gas development, including the "prioritization" requirement;

- weakening restrictions on livestock grazing; and

- granting BLM officials new discretion to exempt plan requirements.

127.   In October 2019, a federal court issued an order preliminarily enjoining BLM from implementing the 2019 Plans in a suit brought by Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians, among others. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019). On the merits, the court expressed concern that BLM weakened many of the protections that the U.S. Fish and Wildlife Service relied upon in its 2015 finding that ESA listing was not warranted, in ways that were contrary to the science. *Id.* at 1332–33. The court found that plaintiffs were likely to prevail on their claims, including that BLM violated NEPA by failing to take the requisite "hard look" at these changes and by failing to supplement its EISs after a last-minute elimination of the compensatory mitigation provision of the 2015 Plans, which the court deemed a "substantial change." *Id.*

128.   That 2019 preliminary injunction has remained in effect since that time while BLM initiated a further sage-grouse planning process, detailed below.

### K.    Adoption of 2025 Plans

129.   On November 22, 2021, BLM under the Biden administration published a Federal Register notice announcing its intent to amend RMPs for BLM-managed sage-grouse habitat in California, Colorado, Idaho, Montana,

Nevada, North Dakota, Oregon, South Dakota, Utah, and Wyoming. *See* Notice of Intent to Amend Land Use Plans Regarding Greater Sage-Grouse Conservation and Prepare Associated Environmental Impact Statements, 86 Fed. Reg. 66,331 (Nov. 22, 2021).

130.   That Notice of Intent stated BLM's finding that the 2019 Plans were "potentially inconsistent with new science and rapid changes affecting the BLM's management of the public lands, including the effects of climate change," and explained the need to address continued sage-grouse declines.

131.   That Notice of Intent also initiated a scoping period, during which Plaintiffs timely submitted comments and scientific literature to support maintaining or strengthening the 2015 Plans.

132.   On March 15, 2024, BLM released a single Draft Environmental Impact Statement ("DEIS") for proposed RMP amendments in Montana/Dakotas, Colorado, Nevada/California, Idaho, Oregon, Utah, and Wyoming, and allowed a 90-day public comment period. *See* 89 Fed. Reg. 18,963 (Mar. 15, 2024).

133.   That Notice asserted that BLM was considering RMP amendments "to improve conservation" of greater sage-grouse habitat and to "provide for consistent conservation across state lines."

134.   Plaintiffs submitted timely comments on the DEIS pointing out the many defects in BLM's proposed plan amendments and analysis of those changes.

They encouraged BLM to improve its proposals following the recommendations of the best available science.

135.   Numerous other individuals, groups, agencies and scientists also submitted comments underscoring the need to maintain and strengthen sage-grouse protections on BLM lands, not weaken them.

136.   These comments included a letter dated June 3, 2024, from 21 leading sage-grouse researchers and scientists, including former federal and state agency scientists. They warned that the sagebrush steppe ecosystem is at a "critical juncture" and requires "aggressive action" to slow the loss of sagebrush habitat. "The science is clear that Greater Sage-Grouse populations will not stabilize if widespread sagebrush habitat loss continues across the range," the scientists wrote. "[T]he time to arrest the decline of the system is short."

137.   The scientists urged BLM to strengthen various plan measures. They underscored that compensatory mitigation and "no net loss" principles are a "critical component of the plan"; stressed the importance of a cross-jurisdictional adaptive management approach using the Targeted Annual Warning System ("TAWS"); recommended a universal 3.0-mile lek buffer for all development activities, critiquing both the inadequacy and state-by-state inconsistencies in BLM's proposed lek buffers; called on BLM to require mandatory adjustments to grazing practices contributing to sage-grouse habitat or population declines; and

concluded BLM failed to adequately protect habitat corridors to allow for genetic connectivity between larger populations.

138.   On November 15, 2024, BLM released its Proposed RMP Amendments and Final Environmental Impact Statement ("FEIS") for the Greater Sage-Grouse Rangewide Planning and opened a 30-day public protest period and 60-day Governors' consistency review period.

139.   In response to U.S. Fish and Wildlife Service feedback that the DEIS's preferred alternative did not provide sufficient protection to avoid the need for ESA listing for sage-grouse, BLM strengthened its preferred alternative in the FEIS. In particular, BLM proposed designating a subset of PHMA as "PHMA with limited exceptions," in which energy development (oil, gas, solar, and wind) would be prohibited without exception. BLM explained that this change was designed "to provide the necessary protections for [greater sage-grouse] and its habitat in light of anticipated development threats and negative impacts from climate change such as drought."

140.   Plaintiffs submitted a timely protest of the proposed RMP Amendments and FEIS in accordance with BLM requirements.

141.   On January 10, 2025, BLM's Assistant Director for Resources and Planning issued a Protest Resolution Report denying all protests.

COMPLAINT - 47

142.   On January 15, 2025, BLM's Principal Deputy Director signed the Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Colorado ("Colorado ROD") and Oregon ("Oregon ROD").[2]

143.   Plan amendments for the remaining states were not completed before the second Trump Administration came into office.

144.   On September 2025, BLM issued a notice that it intended to make "significant changes" to the proposed plan amendments for Montana/Dakotas, Idaho, Nevada/California, Utah, and Wyoming. *See* 90 Fed. Reg. 42,607 (Sept. 3, 2025).

145.   BLM offered a 30-day public comment period on the proposed changes, during which Plaintiffs timely submitted comments.

146.   The proposed changes included: (1) removal of the "PHMA with limited exceptions" designation and its heightened protections; (2) for the Nevada/California and Idaho plans, removal of the 7-inch grass height standard applicable to livestock grazing during nesting/early brood rearing seasons; (3) for the Utah plan, elimination of large portions of GHMA and downgrading of large portions of PHMA to the lesser GHMA protections; (4) for the Nevada/California

---

[2] Plaintiffs do not herein challenge the Oregon ROD, which is already subject to a preliminary injunction and ongoing litigation in *Oregon Natural Desert Association v. Raby*, 3:25-cv-00363 (D. Oregon).

plan, changing GHMA from "avoidance" to "open" for major rights of way; (5) language requiring BLM to implement state adaptive management programs, once adopted, rather than its own TAWS monitoring and adaptive management.

147.   Despite acknowledging that these changes were "significant," BLM did not prepare any NEPA analysis to evaluate them. BLM's justification was that the impacts were somewhere along the "range of effects" of other alternatives evaluated in the FEIS.

148.   On December 22, 2025, BLM issued five Records of Decision approving RMP Amendments for the remaining states. These include the:

a.      Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Montana/Dakotas ("Montana/Dakotas ROD");

b.      Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Idaho ("Idaho ROD");

c.      Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Nevada and Northeastern California ("Nevada/California ROD");

d.      Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Utah ("Utah ROD");

      e.      Greater Sage-Grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Wyoming ("Wyoming ROD").

149.    Together with the Colorado ROD and the December 2024 FEIS, these are the final agency actions challenged in this Complaint.

**L.    Key Elements of the 2025 Plans.**

150.    The 2025 Plans are weaker in nearly all respects than the 2015 Plans and carry through many of the rollbacks approved in the 2019 Plans. They are also significantly weaker than the proposed alternative evaluated in the 2024 FEIS. Though not identical across all states, key elements of the 2025 Plans include:

      a.      <u>SFA Designation</u>: The 2025 Plans eliminate the SFA habitat designation and downgrade these lands to the lesser PHMA protections. Rather than serving as protected refuges, these areas will now be open to large-scale disturbances from mining and oil and gas. BLM claimed the SFA boundaries "no longer reflect the most up to date science" but did not explain why this justified wholly removing, as opposed to refining, the SFA boundaries.

      b.      <u>Mineral Withdrawal</u>: The 2025 Plans eliminate the 2015 requirement that BLM propose a mineral withdrawal for 10 million acres of SFA habitat. BLM failed to reasonably explain this shift, while also misleadingly claiming it had "no impact" because the Secretary of Interior alone can enact a

withdrawal under FLPMA. This ignores that the proposal from BLM was an important step toward a withdrawal, under 43 C.F.R. § 2310.1-2, and that BLM in 2015 concluded the withdrawal proposal had important conservation benefits, which the Service also cited in its October 2015 "not warranted" ESA finding.

      c.    <u>Areas of Critical Environmental Concern (ACECs)</u>: The 2025 Plans designate none of the 14 potential sage-grouse ACECs that BLM itself deemed eligible. In the planning process, BLM worked with state wildlife agencies to identify areas of high value or concern for sage-grouse conservation, for possible designation as sage-grouse ACECs. This process identified 14 potential ACECs spanning 4.2 million acres. BLM found these areas met the "relevance" and "importance" criteria due to their importance to sage-grouse conservation, considering factors such as bird abundance or contributions to habitat or genetic connectivity. BLM also concluded that these 14 areas require "special management attention" to protect those values. Rather than propose to designate them as sage-grouse ACECs, however, the FEIS proposed to designate these same areas as "PHMA with limited exceptions," a new subcategory of protected habitats. But BLM scrapped the "PHMA with limited exceptions" designation in the final RODs, and yet still refused to designate any sage-grouse ACECs without a reasoned explanation.

d.    <u>PHMA With Limited Exceptions</u>: Relatedly, BLM dropped from its 2025 Plans the proposed "PHMA with limited exceptions" designation, in which oil and gas development, and utility-scale solar and wind projects, would have been prohibited without exception. BLM and the states previously delineated these areas as having "areas of high value or concern" for sage-grouse, and BLM concluded they required elevated protections from "known highly probably resource threats" and climate change impacts, such as drought. However, the RODs eliminated "PHMA with limited exceptions" on the basis that states found the added protection unnecessary and "potentially" inconsistent with their plans. However, BLM did not address its own prior factual finding that the designation *was* necessary, given the high value of these areas and known threats. BLM also failed to demonstrate that inconsistency with state plans was a real, not merely conjectural, concern.

e.    <u>Oil and Gas Prioritization</u>: The 2025 Plans eliminate the requirement from the 2015 Plans that BLM prioritize new oil and gas leasing outside sage-grouse habitat. BLM concluded that prioritization was "unnecessary" to protect sage-grouse, pointing to the NSO stipulation that would remain for PHMA. This conclusion is both unsupported and contrary to record evidence. For example, in Wyoming, where sage-grouse are most imperiled by oil and gas development, leases will be subject to NSO protection only within 0.6-mile of

PHMA leks and 0.25-mile of GHMA leks, falling dramatically short of the

scientifically-recommended 3.1-mile lek buffer. The Service and NTT both

concluded these buffers are wholly inadequate to prevent sage-grouse population

declines from oil and gas development. BLM alternatively suggested that

prioritization would be "inconsistent or in tension with" new limits on its

discretion to defer nominated parcels, adopted under the 2025 One Big Beautiful

Bill Act (Pub. L. 119-21), but contradicted itself by claiming the Secretary could

still defer sage-grouse parcels. BLM also suggested prioritization has been

"confusing" to the public, but it gave no evidence of harmful confusion or that

trading an explicit standard for free-wheeling discretion would address that

concern.

      f.    <u>Compensatory Mitigation</u>: The 2025 Plans no longer mandate

"compensatory mitigation" for any states except Colorado and Montana. Though

state compensatory mitigation programs still apply, they are weaker than prior

federal requirements. BLM announced this significant change in the RODs,

without advance public notice or comment, violating its planning regulations. 43

C.F.R. §§ 1610.5-1(b), 1610.2. BLM's explanation—that this change was

necessary to "align with the current [2008] special status species manual"—was

utterly illogical, as the 2008 manual endorses use of compensatory mitigation and

was in effect when the 2015 Plans mandated compensatory mitigation. BLM also

completely disregarded that it has binding regulations requiring compensatory mitigation to offset adverse impacts to public land. *See* 43 C.F.R. § 6102.5.1(a); *see also id.* § 6101.5(d); *id.* § 6102.5.1(c)(5). In the Colorado and Montana RODs, the compensatory mitigation standard was downgraded from "net conservation gain" to "no net habitat loss," and BLM retracted a critical requirement that mitigation be completed before project activity. In all states, compensatory mitigation can now be used in place of avoidance requirements, trading certain protection for often ineffective attempts at restoration.

g.      Lek Buffers: The 2025 Plans weaken or retain scientifically unjustified and inconsistent buffer distances around sage-grouse leks. In Colorado, habitat within 1 mile of leks is no longer closed to leasing, and the 1- to 2-mile lek buffers applicable to lease development in the 2015 plans were eliminated. Additionally, in Colorado, Montana/Dakotas, Nevada/California, and Utah, BLM substantially reduced the certainty that disturbance buffers will be implemented, replacing language stating that lek buffers "will be applied" with language committing only to "evaluate" lek buffers during project approvals. In Wyoming, BLM retained the scientifically unjustified 0.25-mile and 0.6-mile lek buffers, which both the U.S. Fish and Wildlife Service and NTT concluded were inadequate to prevent sage-grouse population declines.

COMPLAINT - 54

h.    <u>Density and Disturbance Caps</u>: The 2025 Plans retain the scientifically unjustified 3 percent disturbance cap from the 2015 Plans. BLM's apparent justification was that sage-grouse only depart a landscape once levels of development exceed 3 percent. However, the two studies BLM offered for that claim—Kirol et al., 2020, and Knick et al., 2013—directly refute BLM. They show that roughly three quarters of sage-grouse will abandon habitat before development levels reach just 1 percent, and that almost no birds will remain by the time development reaches 3 percent. For this reason, Kirol et al., 2020, went so far as to conclude that the 3 percent cap is likely not an "effective conservation strategy." Accordingly, BLM's contrary conclusion that the 3% cap is an "effective" conservation strategy, supported by the "best available science," is both unsupported and contrary to record evidence. The 2025 Plans also further weaken the disturbance and density caps by allowing BLM to allow projects to exceed these limits if a project proponent offers voluntary compensatory mitigation.

i.    <u>Livestock Grazing</u>: The 2025 Plans weaken the already inadequate protections against livestock grazing in several ways, including by dropping the requirement that BLM impose terms and conditions for achieving sage-grouse "habitat objectives" into grazing plans and permits, as they are renewed. BLM also removed requirements that allotments in SFA and PHMA be "prioritize[d]" for field checks to ensure compliance with grazing permits; walked

back required conformance with the scientifically-recommended 7-inch grass height objectives; and weakened requirements for the impacts of grazing-related infrastructure to be addressed. Only the Colorado and Oregon plans include management direction to allow for allotments to be rested upon voluntary permit relinquishment and set limits on the future management of these converted lands.

j.    <u>Adaptive Management</u>: The 2025 Plans update BLM's prior adaptive management program, to better detect and address significant habitat or population declines before they become irreversible. Among other changes, the 2025 Plans adopt a uniform Targeted Annual Warning System ("TAWS") for monitoring and evaluating population and habitat trends, rather than prior variable approaches. The 2025 Plans also use smaller geographic units for tracking declines, to avoid masking local problems. However, for every state but Colorado, BLM inserted language providing that where a state government has adopted an adaptive management process, BLM must implement that in lieu of the uniform federal approach. The 2025 Plans do not establish any minimum requirements for those state adaptive management processes. In requiring use of variable state monitoring approaches, BLM also failed to consider its regulatory requirements to use "standardized" monitoring "to allow data comparisons through space and time." *Id.* § 6103.2(d); *see also id.* § 6102.2(c)(4).

k.  <u>Habitat Management Area Boundaries</u>: The 2025 Plans fail to identify or protect connectivity corridors or winter habitat in most areas. In doing so, BLM ignored the recommendations of sage-grouse experts, who noted the outsized importance of these habitats, and its regulatory duties to identify and protect areas of habitat connectivity. *See, e.g.*, *id.* §§ 6101.5(d), 6102.2(b)(1), 6103.1(b). Additionally, the 2025 Plans made significant last-minute cuts to Utah habitat boundaries, particularly in GHMA. BLM's only explanation was "inconsistencies raised in the Utah Governor's Consistency Review process." However, on this same record, BLM in 2024 found that these boundary inconsistencies "cannot be reconciled" under 43 U.S.C. § 1712(c)(9) because Utah's boundaries are inconsistent with Federal law and policy. It had explained that GHMA habitat not coinciding with Utah habitat designations was being retained due to the presence of "occupied leks, population connectivity across state borders, habitat restoration projects, and other known areas of [sage-grouse] occurrence[.]" BLM entirely failed to grapple with these prior findings or offer a reasoned explanation for its new position in the 2025 RODs.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of FLPMA, FLPMA Regulations, and the APA
### (Multiple-Use-Sustained-Yield and
### Unnecessary-or-Undue-Degradation Mandates)

151.  Plaintiffs reallege and incorporate all paragraphs above.

152.    FLPMA establishes a national policy that "public lands be managed in a manner that will protect the quality" of their "ecological [and] environmental" values and "provide food and habitat for . . . wildlife." 43 U.S.C. § 1701(a)(8).

153.    FLPMA directs that public lands "shall" be managed "for multiple use and sustained yield." *Id.* § 1732(a).

154.    "Multiple use" requires management that "takes into account the long-term needs of future generations for renewable and nonrenewable resources, including . . . wildlife" and "without permanent impairment of the productivity of the land and the quality of the environment." *Id.* § 1702(c).

155.    "Sustained yield" requires "maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* § 1702(h).

156.    FLPMA identifies "wildlife" as one such renewable resource of public lands. *Id.* § 1702(c); *see also id.* § 1702(l) (listing "fish and wildlife development and utilization" as one of six "principal or major uses" of public lands.

157.    This "multiple use and sustained yield" duty requires BLM to manage public lands to sustain their wildlife species, including the greater sage-grouse.

158.    FLPMA further directs that the Secretary of Interior "shall . . . take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

159.    BLM regulations further provide that "BLM must conserve renewable natural resources at a level that maintains or improves future resource availability and ecosystem resilience, in a manner consistent with multiple use and sustained yield." 43 C.F.R. § 6101.5(c).

160.    The U.S. Fish and Wildlife Service determined in 2010 that the greater sage-grouse was in sufficient danger of extinction throughout all or a significant portion of its range that ESA listing was warranted.

161.    BLM acknowledges that the species has continued to decline since that time, despite a decade of management under BLM's 2015 Plans.

162.    The 2025 Plans significantly weaken the sage-grouse protections adopted in the 2015 Plans, in ways unsupported by the best available science.

163.    Defendants failed to reasonably demonstrate that the 2025 Plans nonetheless satisfy its "multiple use and sustained yield" and "unnecessary or undue degradation" duties under FLPMA.

164.    Even though the 2015 Plans have been in effect for over a decade now, sage-grouse populations have continued to decline and key habitats irreversibly lost, sending the species ever further in its downward spiral toward extinction.  By reversing or weakening key protections from the 2015 Plans, the 2025 Plans will certainly accelerate that downward spiral; yet Defendants have never addressed much less acknowledged this fact. In so doing, the 2025 Plans fail

to ensure sustained yield of greater sage-grouse on public lands and failed to avoid

permanent impairment and unnecessary or undue degradation of the public lands

and their wildlife (sage-grouse) resources, in violation of FLPMA.

165.    As a result, the RODs and 2025 Plans they approve are arbitrary,

capricious, an abuse of discretion, and not in accordance with FLPMA and its

implementing regulations, and must be set aside under the APA, 5 U.S.C. § 706.

**SECOND CLAIM FOR RELIEF**
**Violations of the APA**
**(Arbitrary and Capricious Decisionmaking Under FLPMA)**

166.    Plaintiffs reallege and incorporate all paragraphs above.

167.    Under the APA, an agency action must be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2).

168.    The 2025 Plans are arbitrary and capricious because Defendants failed

to articulate a rational explanation for their decisions, offered justifications that run

counter to the evidence before the agency, and disregarded material facts and

evidence, including the best available science on sage-grouse.

169.    The 2025 Plans are arbitrary and capricious because Defendants failed

to grapple with important aspects of the problem, such as the degree to which the

2025 Plans will or will not conserve or recover greater sage-grouse.

170.   The 2025 Plans are arbitrary and capricious because Defendants ignored or countermanded key factual and scientific findings the agency and its scientific advisors reached when promulgating the 2015 Plans, without any explanation for doing so.

171.   The 2025 Plans are arbitrary and capricious because Defendants ignored applicable regulatory requirements.

172.   The 2025 Plans are arbitrary and capricious because they weaken measures from the 2015 Plans without proper consideration of the serious reliance interests the 2015 Plans engendered, including in the U.S. Fish and Wildlife Service's October 2015 "not warranted" ESA listing for greater sage-grouse.

173.   The 2025 Plans are arbitrary and capricious because Defendants failed to consider the effectiveness of their prior 2015 Plans.

174.   The 2025 Plans are arbitrary and capricious because Defendants failed to consider or reasonably explain how their provisions would serve BLM's stated purposes.

175.   The 2025 Plans are arbitrary and capricious because Defendants failed to provide a rational explanation for striking differences across political boundaries, which undermine BLM's stated goal of "consistent conservation across state lines."

176.   The 2025 Plans are arbitrary and capricious because Defendants failed to reasonably explain its refusal to protect sage-grouse connectivity corridors and winter habitat as PHMA in most areas, despite their outsized importance to the species.

177.   The 2025 Plans are arbitrary and capricious because Defendants failed to meaningfully consider or disclose the prevalence of Fee/Fee/Fed oil and gas wells (i.e., wells drilled on private or state lands to access adjacent federal minerals) and how they undermine the presumed effectiveness of plan requirements, which BLM will not apply when approving such wells.

178.   The 2025 Plans are arbitrary and capricious because Defendants rested on inaccurate and unsupported claims; conclusions that ignore or contradict record evidence; and other flawed reasoning.

179.   The RODs and 2025 Plans they approve are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, requiring them to be set aside under the APA, 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**Violations of the APA**
**(Unexplained Departure from BLM Special Status Species Manual)**

180.   Plaintiffs reallege and incorporate all paragraphs above.

181.   BLM's Special Status Species Manual, BLM Manual Section 6840, establishes a BLM policy to manage special status species to avoid the need for

their listing under the ESA, and thereby help fulfill BLM's FLPMA duties as recounted above.

182.   The greater sage-grouse is a BLM-designated "sensitive" species, and thus a special status species covered by that Manual.

183.   As to land-use planning, the Special Status Species Manual directs BLM State Directors to "[e]nsur[e]" that BLM "land use plans . . . identify appropriate outcomes, strategies, restoration opportunities, use restrictions, and management actions necessary to conserve and/or recover listed species . . . [and] Bureau sensitive species."

184.   BLM failed to reasonably consider this policy direction or demonstrate that it adhered to it, by ensuring the 2025 Plans contain the measures necessary to conserve or recover the greater sage-grouse.

185.   BLM also did not provide any explanation for departing from its Special Status Species Manual.

186.   BLM's failure to consider or follow its own Special Status Species Manual, without reasoned explanation, renders the RODs and 2025 Plans they approve arbitrary and capricious, requiring them to be set aside under the APA, 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF
### Violations of FLPMA and the APA
### (Unlawful Subdelegation to State Agencies)

187.   Plaintiffs reallege and incorporate all paragraphs above.

188.   Federal agencies may not subdelegate their authority to states without affirmative evidence of authority to do so. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565-66 (D.C. Cir. 2004).

189.   Congress has not authorized the Secretary of Interior or BLM to subdelegate their authority over federal public lands or resources to the states.

190.   The 2025 Plans improperly delegate such authority to states, pursuant to their adaptive management provisions.

191.   The 2025 Plans each impose an adaptive management process to ensure that if the plans are not effective, corrective action will be implemented. The adaptive management regime requires BLM to monitor habitat and population trends, it sets thresholds of decline that trigger corrective strategies ("soft" and "hard" triggers), and it establishes the management response (e.g., cessation of new development authorizations) to each trigger type.

192.   However, the 2025 Plans for Montana/Dakotas, Idaho, Nevada/California, Wyoming, and Utah each provide that once a State has adopted its own adaptive management regime, BLM must "implement the most recent State adaptive management process" in lieu of that federal process.

COMPLAINT - 64

193.   The 2025 Plans do not establish any minimum requirements for those state adaptive management processes.

194.   Similarly, even where the default federal adaptive management approach is used, the 2025 Plans give states the power to "deactivate" adaptive management actions on federal land by making a unilateral, discretionary determination that "[t]he affected population's abundance or growth rate are sufficient for recovery."

195.   In other words, the 2025 Plans give states the authority to dictate if, when, and how BLM will strengthen its sage-grouse protections on federal land even after significant sage-grouse population or habitat declines are observed.

196.   While FLPMA encourages cooperation with states, tribes, and federal agency partners, it does not permit BLM to subdelegate decisionmaking authority to states in this fashion.

197.   By subdelegating authority to states, the RODs and 2025 Plans they approve for Montana/Dakotas, Idaho, Nevada/California, Utah, and Wyoming are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and arbitrary, capricious, and "not in accordance with law," 5 U.S.C. § 706(2)(A), and must be held unlawful and set aside

## FIFTH CLAIM FOR RELIEF
### Violations of FLPMA, ACEC Regulations, and the APA
### (Failure to Give Priority to Designation and Protection of ACECs)

198.   Plaintiffs reallege and incorporate all paragraphs above.

199.   FLPMA and its implementing regulations require BLM to place a priority on designating and protecting ACECs through the land use planning process. *See* 43 U.S.C. § 1712(c)(3); 43 C.F.R. § 1610.7-2.

200.   In the planning process here, BLM identified 14 potential sage-grouse ACECs covering 4.2 million acres that it found met the "relevance" and "importance" criteria due to their contributions to sage-grouse conservation.

201.   The FEIS also concluded these areas require "special management attention" to protect those values. Rather than designate them as ACECs, however, the FEIS proposed to protect these areas as "PHMA with limited exceptions."

202.   The 2025 Plans scrapped the "PHMA with limited exceptions" designation, yet BLM still refused to designate any ACECs.

203.   The Colorado ROD conceded that the proposed Colorado ACECs met the "relevance" and "importance" criteria, and also required "special management attention." That established a "presumption" in favor of ACEC designation. 43 C.F.R. § 1610.7-2. BLM failed to overcome that presumption based on a reasoned evaluation of the permissible factors in § 1610.7-2, instead basing its decision not to designate the ACECs on an impermissible one: state opposition.

COMPLAINT - 66

204.    The remaining RODs declined to designate ACECs based on a conclusory assertion that the proposed ACEC areas do not require special management attention. However, BLM did not support that conclusion or acknowledge its prior inconsistent findings in the FEIS.

205.    As a result, the RODs and 2025 Plans they approve are arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure under FLPMA and its implementing regulations, and must be set aside under the APA, 5 U.S.C. § 706.

## SIXTH CLAIM FOR RELIEF
### Violations of FLPMA, APA, and BLM Planning Regulations
### (Failure to Ensure Consistency with U.S. Forest Service Plans)

206.    Plaintiffs reallege and incorporate all paragraphs above.

207.    FLPMA requires BLM to "coordinate" its land use plans with those of states and Federal agencies and, to the extent possible, resolve inconsistencies with those plans. 43 U.S.C. § 1712(c)(9).

208.    BLM's planning regulations also require that BLM "resource management plans . . . shall be consistent with officially approved or adopted resource related plans . . . of other Federal agencies . . . so long as the guidance and resource management plans are also consistent with the purposes, policies and programs of Federal laws and regulations applicable to public lands." 43 C.F.R. § 1610.3-2; *see also* 43 C.F.R. § 1610.3-1(d)(1).

COMPLAINT - 67

209.    If "possible and appropriate," BLM must also "develop resource management plans collaboratively" with other Federal agencies. *Id.* § 1610.3-1(a)(5).

210.    BLM acknowledged in 2015 that effective conservation of the greater sage-grouse requires a coordinated, landscape scale approach across Federal land management agencies. This coordination and consistency across Federal land use plans is particularly important for greater sage-grouse, given the landscape-scale nature of its habitat, populations, threats, and conservation needs.

211.    BLM's 2015 Plans were developed collaboratively with the Forest Service, through joint Environmental Impact Statements, and the measures adopted in BLM's 2015 Plans largely coincided with those in the Forest Service's own 2015 sage-grouse plans.

212.    In contrast, BLM's 2025 Plans were not developed together with the U.S. Forest Service, and they unilaterally weaken protections those agencies adopted jointly in 2015. This resulted in broad inconsistencies between the BLM and Forest Service land use plan provisions for greater sage-grouse, including as to habitat designations, compensatory mitigation, SFA protections, lek buffers, Required Design Features, and adaptive management, among other elements.

213. The FEIS acknowledged BLM's statutory duty to coordinate with the Forest Service, and it acknowledged there were inconsistencies between BLM's proposed plans and the 2015 Forest Service sage-grouse plans.

214. However, BLM failed to provide any meaningful explanation for how the inconsistencies were "addressed and, if possible, resolved," 43 C.F.R. § 1610.3-1(f), and "why the inconsistencies . . . cannot be remedied," *id.* § 1610.3-1(d)(2).

215. BLM did not—and could not—claim that the 2015 Forest Service sage-grouse plans are not "consistent with the purposes, policies and programs of Federal laws and regulations applicable to public lands." 43 C.F.R. § 1610.3-2.

216. Accordingly, BLM violated its duty to ensure the 2025 Plans were "consistent with officially approved or adopted resource related plans . . . of other Federal agencies . . . so long as the guidance and resource management plans are also consistent with the purposes, policies and programs of Federal laws and regulations applicable to public lands." 43 C.F.R. § 1610.3-2.

217. As evidenced by the close coordination between these agencies in 2015, it was both "possible and appropriate" for BLM to "develop resource management plans collaboratively" with the Forest Service, *id.* § 1610.3-1(a)(5), yet BLM failed to do so.

218.   Additionally, Defendants failed to even meet their related procedural duties to "[i]dentify areas" of inconsistency, to provide "reasons why the inconsistencies exist and cannot be remedied," and to "[n]otify the other Federal agencies . . . with whom consistency is not achieved and indicate any appropriate methods, procedures, actions and/or programs which the State Director believes may lead to resolution of such inconsistencies." *Id.* § 1610.3-1(d).

219.   In response to comments raising this issue, BLM's Protest Resolution Report did not meaningfully respond, beyond noting the Forest Service did not identify "any concerns regarding the compatibility" with their plans. This explanation does not pass muster, as the regulations do not make BLM's consistency duty contingent on the other agency raising "concerns."

220.   As a result, the RODs and 2025 Plans they approve are arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure under FLPMA and its implementing regulations, and must be set aside under the APA, 5 U.S.C. § 706.

### SEVENTH CLAIM FOR RELIEF
### Violations of BLM Planning Regulations
### (Lack of Public Notice and Comment on Significant Changes)

221.   Plaintiffs reallege and incorporate all paragraphs above.

222.   BLM's land use planning regulations require BLM to provide public notice and comment on any significant change made to a plan after the protest period. *See* 43 C.F.R. §§ 1610.5-1(b), 1610.2(f)(5).

223.   BLM failed to provide public notice or comment on significant changes it made to the 2025 Plans after the protest period, including but not limited to a weaker overall plan goal; the elimination of compensatory mitigation; the elimination of PHMA with limited exceptions in Colorado; and fewer restrictions on granting waivers, exceptions, and modifications of plan protections.

224.   Accordingly, the RODs and 2025 Plans they approve are arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure under BLM's planning regulations, requiring them to be set aside under the APA, 5 U.S.C. § 706(2).

## EIGHTH CLAIM FOR RELIEF
### Violations of NEPA and APA

225.   Plaintiffs reallege and incorporate all paragraphs above.

226.   NEPA requires federal agencies to prepare an EIS containing a "detailed statement" of the "reasonably foreseeable environmental effects" of every proposed "major federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In doing so, agencies must "ensure the professional integrity, including scientific integrity, of the discussion and

analysis in an environmental document" and "make use of reliable data and resources." *Id.* § 4332(2)(D)–(E).

227.    The 2024 FEIS, and RODs and 2025 Plans that rely upon that 2024 FEIS, violate these NEPA standards in one or more ways, including by:

    a.  failing to establish an accurate environmental baseline;

    b.  contradicting or failing to make use of the best available science;

    c.  failing to take a hard look at the effects of the 2025 Plans and proposed alternatives on greater sage-grouse;

    d.  failing to consider a reasonable range of alternatives or offer a reasonable explanation for rejecting viable and feasible alternatives offered by the public during the NEPA process;

    a.  failing to address data and evidence on the baseline effectiveness or ineffectiveness of its 2015 Plans;

    b.  failing to take a hard look at the impacts of oil and gas development on sage-grouse, including the effects of BLM's decision to eliminate the "prioritization" requirement and new constraints on BLM's authority to defer sage-grouse habitat from lease sales, under the One Big Beautiful Bill Act (Pub. L. 119-21);

    c.  failing to meaningfully consider how the prevalence of Fee/Fee/Fed oil and gas wells undermines the presumed effectiveness of the oil and

gas mitigation requirements, which BLM does not mandate when approving such wells;

d.  failing to take a hard look at the effects of grazing on sage-grouse;

e.  failing to take a hard look at the effects of mining on sage-grouse;

f.  failing to identify or take a hard look at the effects on sage-grouse winter habitat;

g.  failing to take a hard look at the effects of each alternative's approach to waivers, exceptions, and modifications;

h.  failing to take a hard look at the impact of deferring to state adaptive management programs;

i.  failing to take a hard looks at impacts to sage-grouse population connectivity;

j.  failing to "consider effects to relevant land health standards," as required under 43 C.F.R. § 6103.1.1(d)(2);

k.  failing to take a hard look at cumulative impacts to sage-grouse;

l.  improperly segmenting the analysis of the SFA mineral withdrawal;

m. failing to respond to public comments raising substantial issues and concerns; and

n. failing to prepare a supplemental EIS to address significant changes to its proposed action and to circumstances bearing on the environmental effects of the various alternatives.

228. Accordingly, the RODs, the 2025 Plans they approve, and their supporting FEIS are arbitrary, capricious, and not in accordance with NEPA, and therefore must be set aside under the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Order, declare, and adjudge that Defendants violated NEPA, FLPMA, the APA, and/or their implementing regulations in preparing and approving the RODs, 2025 Plans, and FEIS, for one or more of the reasons identified above;

B. Reverse and set aside the RODs, 2025 Plans, and FEIS;

C. Issue a remand order requiring Defendants to undertake legally valid NEPA analysis and new land use planning process in order to cure the legal violations and defects found by the Court;

D. Enter such other injunctive relief as Plaintiffs may pray for hereafter;

E. Stay the effective date of the 2025 Plans under 5 U.S.C. § 705;

F. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses incurred in pursuing this action, pursuant to 28 U.S.C. § 2412(d), and other applicable provisions; and

COMPLAINT - 74

G.      Grant such other and further relief as the Court deems just and proper.


Dated: March 2, 2026                    Respectfully submitted.

                                        /s/ Andrew Hursh
                                        Andrew Hursh (MT Bar No. 68127109)
                                        ADVOCATES FOR THE WEST
                                        117 W. Broadway
                                        Missoula, MT 59802
                                        (208) 268-5210
                                        ahursh@advocateswest.org

                                        /s/ Sarah K. Stellberg
                                        Sarah Stellberg (ID Bar No. 10538)*
                                        Margaret Parker (CA Bar No. 358181)*
                                        ADVOCATES FOR THE WEST
                                        P.O. Box 1610
                                        Boise, ID 83701
                                        (208) 342-7024
                                        sstellberg@advocateswest.org
                                        mparker@advocateswest.org
                                        *pro hac vice forthcoming

                                        *Counsel for Plaintiffs*

COMPLAINT - 75