**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JERRY DAVIS, in his official capacity as Montana-Dakotas State Director, U.S. Bureau of Land Management, *et al*, <br><br> Defendants. | CV-26-21-BMM <br><br><br><br> ORDER |

**INTRODUCTION**

Plaintiffs Center for Biological Diversity, Gallatin Wildlife Association, Great Old Broads for Wilderness, Rocky Mountain Wild, Sierra Club, Western Watersheds Project, and WildEarth Guardians (collectively "Plaintiffs") filed suit against Defendants Jerry Davis, in his official capacity as Montana-Dakotas State Director, Bureau of Land Management; Joseph Stout, in his official capacity as California State Director, Bureau of Land Management; Meagan Conry, in her official capacity as Acting Idaho State Director, Bureau of Land Management; Jon K. Raby, in his official capacity as Nevada State Director, Bureau of Land

1

Management; Tom Heinlein, in his official capacity as Acting Utah State Director, Bureau of Land Management; Kristina Kirby, in her official capacity as Acting Wyoming State Director, Bureau of Land Management; Bill Groffy, in his official capacity as Principal Deputy Director, Bureau of Land Management; and United States Bureau of Land Management ("BLM"). (Doc. 1.) Plaintiffs challenge the BLM's 2025 Records of Decision ("RODs") approving Resource Management Plan Amendments ("RMPAs") for greater sage-grouse in Montana, California, Colorado, Idaho, Nevada, North Dakota, South Dakota, Utah, and Wyoming ("2025 Plans"). (*Id*. ¶ 1.) The Court permitted the State of Wyoming to intervene as of right as a Defendant in the case on April 15, 2026. (Doc. 18.)

Intervenor-Defendant Wyoming filed a motion asking the Court to dismiss Plaintiffs' claims regarding the 2025 Wyoming Record of Decision ("ROD") and Resource Management Plan Amendment ("RMPA"), or in the alternative, to sever and transfer those claims to the United States District Court for the District of Wyoming. (Doc. 21.) Federal Defendants filed a separate motion asking the Court to transfer the entire case to the District of Wyoming. (Doc. 24.) The Court permitted Plaintiffs to file a single consolidated response to both motions. (Doc. 27.) Plaintiffs oppose both motions. (Doc. 29.) The Court held a hearing on the matter on July 6, 2026. (Doc. 42.)

## BACKGROUND

Sage-grouse occupy habitat across the American West. Sage-grouse require sagebrush ecosystems for food, shelter, breeding, nesting, and brooding. 75 Fed. Reg. 13,987 (Mar. 23, 2010). The U.S. Fish & Wildlife Service ("FWS") listed sage-grouse as "warranted" but "precluded by higher priority listing actions" under the Endangered Species Act ("ESA") in 2010 and earlier in 2001. *Id*. at 13910; 66 Fed. Reg. 22984 (May 7, 2001). Numerous plaintiffs challenged in court these decisions not to list sage-grouse. (Doc. 1 ¶ 99-100.)  As part of a settlement in 2011, FWS pledged to make a new listing decision by September 30, 2016. *See In re Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 975 (D.C. Cir. 2013) (summarizing 2011 settlement).

BLM undertook a comprehensive land management planning process in anticipation of the 2016 deadline with the intention of protecting greater sage-grouse habitat and making an ESA listing unnecessary. (Doc. 1 ¶ 3-4, 99-113.) BLM manages most sage-grouse habitat land and the U.S. Forest Service ("USFS") manages some of the habitat. Sage-grouse is considered a "sage-brush obligate" species meaning that they rely on sagebrush for their survival year-round, including for food, cover, and reproduction habitats. (*Id*. ¶ 86.) Conservation of sagebrush landscapes proves critical to preservation of sage-grouse as a result. (*Id*. ¶ 91.) Sage-grouse specifically require large and interconnected patches of healthy sagebrush

habitat to survive. (*Id.*)

BLM adopted the 2015 Plans as part of these comprehensive efforts to prevent ESA listing. (Doc. 1 ¶ 112.) Despite these 2015 Plans, sage-grouse populations have decreased to a concerning degree recently, and over the past two decades. (*Id.* ¶ 88.) Sage-grouse populations have declined 80 percent since 1965, with over half of that loss occurring only in the last two decades. (*Id.*) The sage-grouse population in North Dakota appears to be effectively extinct, and South Dakota's sage-grouse population stands on the brink of extinction. (*Id.* ¶ 90.) A 2025 study from the USGS in partnership with BLM found that sage-grouse populations continue to decline at an average rate of 3 percent annually. (*Id.* ¶ 89.) This same study predicts that two-thirds of all sage-grouse leks are likely to be extirpated in the foreseeable future. (*Id.*) Habitat loss contributes greatly to declines in sage-grouse populations. (*Id.* ¶ 91.)

BLM announced in 2021 that it would be undertaking a new planning effort to "address continued [sage-grouse] and sagebrush habitat loss and [sage-grouse] population declines," and to incorporate "new science and rapid changes affecting the BLM's management of the public lands." (*Id.* ¶ 129.); *see* 86 Fed. Reg. 66331, 66331-32 (Nov. 22, 2021). The 2021 initiative addresses BLM lands across all ten states covered by the 2015 Plans. (Doc. 1 ¶ 129.) BLM released a single Draft Environmental Impact Statement ("DEIS") on March 15, 2024, with a 90-day

comment period. (*Id.* ¶ 132, citing 89 Fed. Reg. 18,963 (Mar. 15, 2024).)

BLM released its Proposed RMPAs to the 2015 Plans on November 15, 2024. (*Id.* ¶ 138.); *see* 89 Fed. Reg. 90311, 90311 (Nov. 15, 2024). The RMPAs covered all ten habitat-containing states and were supported by a single Final Environmental Impact Statement ("FEIS"). (*Id.*, citing 89 Fed. Reg. at 90311.) BLM announced its intention to make "significant changes" to the proposed RMPAs in September 2025 and finalized the 2025 Plans in December 2025. (*Id.* ¶¶ 144, 148, citing 90 Fed. Reg. 42,607 (Sept. 3, 2025).) The 2025 Plans issued five new RODs for the remaining eight states, based on the previous single FEIS. (*Id.* ¶¶ 147-149.)

Plaintiffs allege the 2025 Plans significantly weaken numerous provisions of the 2015 Plans. (*Id.* ¶ 150.) Plaintiffs allege that BLM's 2025 Plans remove and change the 2025 Plans in the following key elemental ways: downgrades Sagebrush Focal Areas ("SFAs"); abandons a provision of the prior plans calling for a mineral withdrawal that would have prevented mining on 10 million acres of sage-grouse habitat; designates no Areas of Critical Environmental Concern ("ACECs"); eliminates Priority Habitat Management Areas ("PHMAs"); removes the previous oil and gas leasing prioritization requirement; eliminates previous compensatory mitigation mandate; weakens previous lek buffers; retains the "scientifically unjustified 3 percent disturbance cap from the 2015 Plans;" weakens protections against livestock grazing; fails to require standardized monitoring; and fails to

identify or protect connectivity corridors or winter habitat in most areas. (*Id*.)

BLM has explained that the administrative record for the 2025 Plans remains largely "the same [across multiple states] due to the nature of BLM's planning and NEPA process." (Doc. 25 at 20.) BLM's FEIS for the 2025 Plans "applied regional 'Habitat Assessment Framework' (HAF) units to assess impacts to sage-grouse from its planning decisions. (Doc. 25 Ex. 1 at 20 [FEIS] at 12 (2024).) The HAF unites apply regional management zones that extend beyond state lines. (Doc. 25 Ex. 2 at 4 [FEIS Appendix, map].)

The Western Energy Alliance ("WEA") filed suit challenging the 2025 Plans in the District of Wyoming on December 23, 2025. *See Complaint*, *W. Energy All. v. U.S. Dept. of the Interior ("WEA")*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), Dkt. No. 1. WEA amended the complaint in early March to add Wyoming as a plaintiff. *See* Am. Compl., *W. Energy All. v. U.S. Dept. of the Interior*, No. 1:25-cv-299-KHR (D. Wyo. Mar. 10, 2026), Dkt. No. 6 ("*WEA* Amended Complaint"). The *WEA* "complaint seeks a declaratory judgment that BLM complied with the requirement of the FLPMA to ensure consistency with state plans 'to the maximum extent [the secretary] finds consistent with Federal law and the purposes of the act.'" (Doc. 23 at 13, citing *WEA*, *WEA* Amended Complaint, No. 1:25-cv-299-KHR, at ¶¶ 72-88.)

The two other pending suits challenging the 2025 Plans remain filed in the

District of Montana, including this case and *Montana Wildlife Federation v. Burgum ("MWF")*, No. 4:26-cv-133-BMM (D. Mont. Mar. 26, 2026). Plaintiffs filed both suits in March 2026. Environmental groups brought both these suits. Wyoming, as an intervenor-defendant, and the federal defendants filed similar motions to dismiss or transfer in *MWF*. *See Brief for Motion to Change Venue, Motion to Dismiss*, *MWF*, No. 4:26-cv-133-BMM (D. Mont. May 26, 2026), Dkt. 18; *see also Brief for Motion to Transfer to the District of Wyoming*, *MWF*, No. 4:26-cv-133-BMM (D. Mont. June 10, 2026), Dkt. 22. The Court denied Wyoming's and Federal Defendants' motions to change venue, dismiss, and transfer in *MWF*. *See Order Denying Motion to Dismiss, or in the Alternative, to Sever and Transfer, and Motion to Transfer*, *MWF*, No. 4:26-cv-133-BMM (D. Mont. July 24, 2026), Dkt. 34.

## LEGAL STANDARD

A court may dismiss a complaint if it is brought in an improper venue pursuant to Fed. R. Civ. P. 12(b)(3). *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). The plaintiff bears the burden of demonstrating that venue is proper. *Id.* A plaintiff must establish proper venue as to each claim where multiple claims are presented. *W. Org. of Res. Councils v. BLM*, No. CV 16-21-GF-BMM, 2021 WL 718857, at *11 (D. Mont. Jan. 24, 2017). Where venue is improper, a district court has the discretion to dismiss the case under Rule 12(b)(3) or transfer the case in the interests of justice to an appropriate jurisdiction under 28 U.S.C. §

1406(a). *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992); *Pac. Coast Dist., M.E.B.A. v. Alaska*, 682 F.2d 797, 799 (9th Cir. 1982). A court draws all reasonable inferences in favor of the non-moving party if the claims present genuine contested facts. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138-40 (9th Cir. 2004).

District courts possess broad discretion when evaluating whether to sever claims pursuant to Fed. R. Civ. P. 21. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000). Claims against different parties may be severed for trial or other proceedings if the court determines that the interests of justice would be better served by severance. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp.2d 10, 13 (D.D.C. 2001). Severance should be denied where the plaintiffs' allegations involve a common series of transactions and occurrences that raise common questions of law and fact applicable to all defendants. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).

### DISCUSSION

The Court addresses separately the question of whether venue proves proper in Montana, and if it is, whether the Court nonetheless should transfer the case to the District of Wyoming for the convenience of the parties pursuant to 28 U.S.C. § 1404(a).

### I.      Whether Venue Proves Proper in Montana

Wyoming asserts that the Court properly must either dismiss or sever and

transfer Plaintiffs' claims related to the Wyoming ROD/RMPA to the District of Wyoming due to improper venue. (Doc. 22 at 12-13.) Plaintiffs contend that Wyoming, as an intervenor, properly cannot raise an improper venue defense. (Doc. 30 at 15.) Plaintiffs argue first that Wyoming cannot raise the improper venue defense when it joins as an intervenor, and second, because Wyoming cannot raise another party's defense. (*Id*. at 15-16.) The Court will address Plaintiffs' argument first before addressing the propriety of venue in Montana.

## A. Whether Wyoming Can Raise an Improper Venue Defense as an Intervenor.

Plaintiffs assert that "'[w]hen a party seeks to enter pending litigation as an intervenor, he enters the litigation subject to the venue which already exists.'" (Doc. 30 at 15, quoting *Eleutian Tech., LLC v. Global Educ. Techs., LLC*, No. 07-cv-00181-ABJ, 2008 WL 11337640, at *4 (D. Wyo. Dec. 30, 2008) (quoting *Commonwealth Edison Co. v. Train*, 71 F.R.D. 391, 394 (N.D. Ill. 1976)).) Plaintiffs acknowledge that the Ninth Circuit in *SEC v. Ross*, left open the door for a non-party intervenor under Rule 24(a)(2) to raise objections to personal jurisdiction and venue. 504 F.3d 1130, 1148-1151 (9th Cir. 2007). The Ninth Circuit determined that "[t]he intervenor has consented to something, but it is not personal jurisdiction." *Id.* at 1150.

The Ninth Circuit's approach to the question of intervention and consent to

personal jurisdiction remains in the minority of other Circuits, district courts, and guidance from Wright and Miller. *See County Sec. Agency v. Ohio DOC*, 296 F.3d 477, 483 (6th Cir. 2002) (determining that "a motion to intervene is fundamentally incompatible with an objection to personal jurisdiction"); *see City of Santa Clara v. Klepp*, 428 F.Supp.315, 317 (N.D. Cal. 1976) (holding that "by voluntarily intervening in this action under [Fed. R. Civ. P. 24] [the defendant] has submitted to the jurisdiction of this court"); Wright, Miller, & Kane, Federal Practice and Procedure, Civil 3D § 1920, at 612 (3d ed. 2001) (stating that "the intervenor submits himself to the personal jurisdiction of the court by seeking to intervene in the action and cannot move to dismiss on that ground"); *see also* Wright, Miller, & Kane, § 1918 Venue, 7C Fed. Prac. & Proc. Civ. § 1918 (3d ed. April 2026 update) ("The intervenor cannot question venue. By voluntarily entering the action the intervenor has waived the privilege not to be required to engage in litigation in that forum."); *see also Montana Wildlife Fed'n v. Burgum*, No. CV-18-69-GF-BMM, 2026 WL 1707576, at *14 (D. Mont. June 12, 2026) (discussing issue in context of permissive intervenor).

*Ross* held that a party intervening as a matter of right under Rule 24(a) did not automatically consent to personal jurisdiction and *Ross* did not foreclose the opportunity for an intervenor as of right to raise objections to personal jurisdiction. *Ross*, 504 F.3d at 1149. The Ninth Circuit based its reasoning on the fact that the

intervenor had "'objected to in personam jurisdiction as effectively as [he] could have' at every turn," *id.* at 1149 (quoting *Teyseer Cement Co. v. Halla Maritime Corp.*, 749 F.2d 472, 478 (9th Cir. 1986)), and did so "promptly and unambiguously when he filed his answer." *Ross*, 504 F.3d at 1149. The Court reiterates that the Ninth Circuit in *Ross* did not decide whether an intervenor may challenge venue. The Court further observes that personal jurisdiction and venue possess important distinctions as personal jurisdiction relates to the Court's power over the party, whereas venue typically relates to convenience.

Wyoming argues that *Ross* clearly suggests that an intervenor under Rule 24(a) retains procedural and jurisdictional defenses. (Doc. 36 at 8.) Wyoming cites the Ninth Circuit's statement that "[i]f the third party is intervening of right, as [the defendant] was [t]here, we see little reason to deprive him of any of his procedural defenses merely because the original plaintiff failed to name him as a defendant or because no other party sought to have him joined pursuant to Rule 19." *Ross*, 504 F.3d at 1150. Wyoming further observes that the Court in *Mont. Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM, 2022 WL 2438963, at *5 (D. Mont. July 5, 2022), considered the defendant-intervenor Wyoming's improper venue argument. Wyoming additionally cites *Coal. of Arizona/New Mexico Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 844 (10th Cir. 1996), which states that "[i]f a party has the right to intervene under Rule 24(a)(2), the intervenor becomes

11

no less a party than others and has the right to file legitimate motions, including venue motions."

The Court determines that it proves proper to address on the merits Wyoming's arguments concerning improper venue given the lack of clarity in the case law concerning an intervenor's specific procedural rights. The Court recognizes that *Ross* suggests that a defendant-intervenor retains procedural rights that may include improper venue arguments. The Court declines to definitively adopt such a conclusion, however, as the Ninth Circuit's dicta provides no clear direction.

**B. Whether Wyoming Can Raise Another Party's Improper Venue Defense.**

Plaintiffs also contend that Wyoming cannot raise another party's defense and specifically cannot argue that venue proves improper as to Federal Defendants. (Doc. 30 at 17, citing *Pratt v. Rowland*, 769 F.Supp.1128, 1132 (N.D. Cal. 1991).) *Pratt* stated that "[i]mproper venue is a defense personal to the party to whom it applies. Thus one defendant may not challenge venue on the ground that it is improper as to a co-defendant." 769 F.Supp. at 1132. Plaintiffs correctly assert that Federal Defendants do not raise an improper venue argument and instead only argue for transfer based on convenience.

Wyoming first argues that venue "needs to be proper as to the Wyoming claims and Wyoming as a Defendant-Intervenor." (Doc. 36 at 11.) Wyoming also asserts that the Ninth Circuit has "recently observed that an intervenor may validly

12

challenge venue based on the status of an original party." (*Id.*, citing *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, and Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1177 (9th Cir. 2021) (stating that the intervenor's venue arguments are "well taken" but deciding the case on the defendant's motion to dismiss).) Wyoming argues that *Pratt* proves different as the new intervenor defendants in *Pratt* were attempting to raise improper venue arguments that the original defendants had failed to raise in their initial responsive pleading and had therefore waived. (Doc. 36 at 12.) The Court agrees that *Pratt* proves factually different. *Pratt* does not limit its statement to those facts. *Pratt* does not represent binding authority, however, and the Court determines it proves proper to consider Wyoming's improper venue arguments on the merits.

## C. Whether Venue Proves Proper in Montana.

Plaintiffs assert that venue remains proper in the District of Montana. (Doc. 30 at 18.) In civil actions against an agency or officer of the United States, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1); *see also Bernhardt*, 2022 WL 2438963, at *4. A plaintiff must establish proper venue for each claim where multiple claims are presented. *W. Org. of Res. Councils v. BLM*

13

*("WORC I")*, No. CV 16-21-GF-BMM, 2021 WL 718857, at *11 (D. Mont. Jan. 24, 2017).

A court affords substantial deference to a plaintiff's choice of forum so long as the forum represents a proper venue. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *Anderson v. Thompson*, 634 F. Supp. 1201, 1204 (D. Mont. 1986). Multiple proper venues may exist for a claim. *WORC I*, 2017 WL 374705, at *4 (D. Mont. Jan. 25, 2017) (citing *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)). No requirement exists that the chosen venue represents the best choice. *WORC I*, 2017 WL 374705, at *4 (citing *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)). Venue merely must be proper in the relevant federal district to survive a motion to dismiss. *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt. ("WORC II")*, No. 4:20-CV-76-BMM, 2021 WL 718857, at *3 (D. Mont. Feb. 24, 2021).

Plaintiffs contend that venue proves proper in Montana on the following three grounds: (1) Plaintiff Gallatin Wildlife Association resides in Montana and this action does not involve real property; (2) Defendant Jerry Davis, Montana/Dakotas Bureau of Land Management State Director, resides in Montana; and (3) under the pendent doctrine venue. (Doc. 30 at 18-21.) The Court will address each ground in turn.

**i.     Whether Plaintiff Gallatin Wildlife Association Resides in Montana and This Action Involves Real Property.**

Plaintiffs contend that venue proves proper on the first ground as Plaintiff Gallatin Wildlife Association resides in Montana and this action involves no real property. (Doc. 30 at 18-19.) Wyoming disagrees and asserts that this action involves real property because the "Wyoming RMPA governs rights-of-way, lease sales, where different natural resources can be developed, grazing rights, and other real property interests." (Doc. 22 at 17.) Wyoming concedes that the Court previously has concluded that challenges to land use plans do not implicate real property pursuant to 28 U.S.C. § 1391(e)(1)(C). (*Id*. at 16-17, citing *WORC II*, 2021 WL 718857, at *3-4; *Bernhardt*, 2022 WL 2438963, at *6-7.)

Wyoming now asks the Court to revisit its previous decisions and instead adopt the reasoning of the court in *W. Watersheds Project v. Burgum*, No. 1:18-CV-00187-REP, 2025 WL 3853055 (D. Idaho Dec. 29, 2025). *Burgum* concluded that the action involved real property, contrary to the decision in *Bernhardt*. *Burgum*, 2025 WL 3853055, at *11. *Burgum* reasoned that the plain meaning of the term "involved" "means that real property 'is part of, included in, or associated with' an action." *Id*. at *16. *Burgum* rejected *Bernhardt*'s conclusion that "the touchstone of the venue provision 'cannot sensibly be whether real property is marginally affected by the case at issue. Rather, the action must center directly on the real property, as with actions concerning the right, title or interest in real property.'" *Id*., quoting *Bernhardt*, 2022 WL 2438963, at *7 (quoting *WORC II*, 2021 WL 718857, at *4

15

(internal citation omitted)). The court in *Torongo v. United States Dep't of Interior*, No. 25-11263, 2026 WL 597414 (E.D. Mich. Mar. 3, 2026), recently found *Bernhardt* "persuasive" and concluded that a national monument "designation's regulatory impact on [the plaintiff's] mining claims [did] not 'involve' real property for purposes of § 1391(e)(1)(C) because the claims [] [did] not center on the right, title, or interest in his mining claims." *See also Ctr. for Env't L. & Pol'y v. United States Bureau of Reclamation*, No. C08-1730RAJ, 2009 WL 10668581, at *4 (W.D. Wash. May 12, 2009) (concluding the same).

The Court addressed the conflict between *Burgum* and the Court's previous cases in *Bernhardt*, 2026 WL 1707576, at *4 (D. Mont. June 12, 2026). The Court declined to apply the standard adopted by the Idaho court and reasoned that the Idaho decision would remain only persuasive authority until the Ninth Circuit answers the question left open from the Idaho decision. *Id*. The Court again will continue to follow this approach and declines to revisit its previous analysis. The Court also agrees with Plaintiffs' argument that even if it were to apply *Burgum*'s reasoning, it remains unclear whether any real property interests would be involved in this action because it does not concern oil and gas leases which all parties in *Burgum* agreed constituted interests in real property. (Doc. 30 at 19-20, citing *WORC II*, 2021 WL 718857, at *3.); *see Burgum*, 2025 WL 3853055, at *11 n.9. The Court emphasizes that additional grounds for venue exist even if the framework changes for

16

involvement of real property pursuant to § 1391(e)(1)(C).

### ii.      Defendant in Action Resides in Montana.

Plaintiffs contend that Defendant Davis resides in Montana which proves sufficient to confer venue in this Court. (Doc. 30 at 20.) Wyoming contends that the residence of the Montana BLM State Director proves inadequate to establish venue in Montana for the challenges to the Wyoming ROD/RMPA because Defendant Davis lacks any connection to the Wyoming ROD/RMPA. (Doc. 22 at 13-14.) Wyoming asserts that the Wyoming BLM State Director "was the sole approver of the Wyoming ROD/RMPA." (*Id*. at 13.)

Plaintiffs assert that 28 U.S.C. § 1391(e)(1)(A) states that an action may be brought in any judicial district "in which . . . *a* defendant *in the action* resides." (Doc. 30 at 20) (emphasis added). Plaintiffs argue that the statute specifically states a defendant "*in the action*" rather than a defendant for a particular *claim*. (*Id*. at 20-21.) Plaintiffs further distinguish between a claim and an action to demonstrate the arguably wider application of § 1391(e)(1)(A) as compared to § 1391(e)(1)(B). (*Id*.) Wyoming provides no specific response to this argument. (*See* Doc. 36.) The Court generally agrees.

The Court also adopts the reasoning that it previously applied in *Bernhardt*. The Court recognizes that Plaintiffs must establish venue over individual claims when multiple, distinguishable claims exist. *WORC II*, 2021 WL 718857, at *3

(citing *Martensen v. Koch*, 942 F. Supp. 2d 983, 996 (N.D. Cal. 2013)). The Court concludes, however, that Plaintiffs' challenge here applies to BLM's 2025 Plans, as a whole, based on the single draft plan amendment, single FEIS, and range-wide management approach. The defendants in *Bernhardt* argued that the plaintiffs' challenges presented separate claims against each individual leasing sale/lease. *Bernhardt*, 2022 WL 2438963, at *5. The Court disagreed and reasoned that the plaintiffs' claims challenged national directives and specifically alleged that the defendants violated a particular federal statute by issuing and following a single federal instruction memorandum that BLM released to guide oil and gas leasing decisions. *Id*.

Wyoming's arguments mirror the arguments rejected in *Bernhardt*. Wyoming attempts to distinguish *Bernhardt* by arguing that the objects of this case "are the individual state RODs/RMPAs, not a national directive." (Doc. 22 at 15.) Wyoming concedes that Plaintiffs challenge the 2024 FEIS, which addressed all the relevant RODs/RMPAs, but argues that the 2024 FEIS "is not a national directive" like that challenged in *Bernhardt*. (*Id*.) Plaintiffs provide no direct argument on the specific matter. (*See* Doc. 30.) The Court recently addressed a similar issue in *Montana Wildlife Federation, et al., Plaintiffs, v. Douglas Burgum, in his official capacity as Sec'y of the Interior, et al., Defendants ("MWF")*, No. CV-26-133-BMM, 2026 WL 2137993 (D. Mont. July 24, 2026).

18

The Court again remains unpersuaded by Wyoming's attempts to distinguish this case from *Bernhardt*. This case, like *Bernhardt* and *MWF*, involves a wide-scale federal management plan and analysis. Like the instruction memorandum and agency memorandum at issue in *Bernhardt*, the 2024 FEIS and single draft plan amendment present decision-making beyond the state-level, and rather, represents a centralized approach to sage-grouse management. The Court recognizes that BLM issued individual RODs/RMPAs for many of the states, yet those plans themselves indicate regional planning, coordination, and nearly identical analysis and reasoning. *See MWF*, 2026 WL 2137993, at * 4. The Court concludes that both *Bernhardt* and *WORC II* support the decision to maintain venue.

*WORC II* similarly involved challenges to separate RODs/RMPAs. 2021 WL 718857, at *5. *WORC II* reasoned that venue proved proper partially due to the "interconnected ecology" and the shared "unique procedural history" of the case. *Id*. at *5-6. *WORC II* determined that severance proved improper because the plaintiffs "allege[d] identical NEPA flaws" and the BLM had issued "'mirror' SEISs." *Id*. The Court concludes that Plaintiffs' claims, like those in *MWF*, do not challenge "independent state-specific planning determinations, but a nationally directed process that resulted in range-wide decisions." *MWF*, 2026 WL 2137993, at * 5 (internal citation omitted). Plaintiffs' challenges claim that "BLM violated the law in the *same way* with respect to each of the challenged RMPAs" "with limited

exceptions." (Doc. 30 at 14.) Wyoming fails to distinguish case law persuasively. The Court concludes that it properly can exercise venue over Plaintiffs' challenges to the Wyoming ROD/RMPA.

The Court notes that Plaintiffs fail to argue the alternative ground for venue that a substantial part of the events giving rise to Plaintiffs' claims occurred in Montana. (*See* Doc. 30.) The Court recently determined in *MWF* that such ground provided an alternative basis for proper venue in Montana in a similar action. *See MWF*, 2026 WL 2137993, at * 5-6. The Court declines to address this issue here as Plaintiffs do not assert it.

### iii.     Whether Pendent Venue Properly Exists.

Plaintiffs assert that the pendent venue provides another avenue for proper venue over Plaintiffs' challenge to Wyoming's RMPA. (Doc. 30 at 21-22.) Plaintiffs cite *Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1089 (N.D. Cal. 2018) (internal citations omitted), which states that "under the pendent venue doctrine, when one or more claims are closely related (*e.g.*, arise out of a common nucleus of operative facts), venue is proper as to all claims so long as venue is established for just one claim. This is because, where there is a close relationship, then judicial economy, convenience, and fairness all weigh in favor of adjudication in one proceeding." (Doc. 30 at 21-22.) Plaintiffs further cite *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 295 (D. Mont. 2019), which concludes that "[w]hen

one or more claims are closely related, in that they arise out of a common nucleus of operative facts, venue proves proper as to all claims so long as venue is established for just one claim." (Doc. 30 at 22.) The Court agrees with Plaintiffs that their challenges to Wyoming's RMPA closely relate to their challenges to Montana's and the other states' RMPAs. Plaintiffs' challenges claim that "BLM violated the law in the *same way* with respect to each of the challenged RMPAs" "with limited exceptions." (Doc. 30 at 14.) Plaintiffs' challenges generally allege "common errors that Federal Defendants made with respect to all the challenged RMPAs." (*Id.* at 29.)

The Court finds distinguishable and uncompelling the reasoning in *Burgum*, 2025 WL 3853055, at *17. *Burgum* involved a different legal and factual background compared to the issue here. The Court recognizes that the Wyoming RMPA is not identical to RMPAs from Montana or other states. The Court finds, however, that more similarities than differences exist between the RMPAs. The RMPAs rely on the same FEIS, involve shared decisionmakers and contributors, relate to regional management schemes, largely share an administrative record, and allegedly suffer from the same flaws. *See Saravia v. Sessions*, 280 F.Supp.3d 1168, 1192 (N.D. Cal. 2017) (stating that, "[w]here a case is built around a 'single wrong, common issues of proof, and similar witnesses,' pendent venue is more likely to be appropriate"). The close relationship between the challenges supports the conclusion that "judicial economy, convenience, and fairness all weigh in favor of adjudication

21

in one proceeding." *Serv. Women's Action Network*, 320 F. Supp. 3d at 1089 (internal citation omitted). The Court next addresses Wyoming's and Federal Defendants' requests to transfer the case, or specific claims, to the District of Wyoming pursuant to 28 U.S.C. § 1404(a).

## II.    Transfer Pursuant to 28 U.S.C. § 1404(a)

Wyoming asks the Court to sever and transfer Plaintiffs' claims challenging the Wyoming ROD/RMPA to the District of Wyoming pursuant to 28 U.S.C. § 1404(a). (Doc. 22 at 19-20.) Federal defendants seek to transfer the entire to case to the District of Wyoming pursuant to 28 U.S.C. § 1404(a). (Doc. 25 at 16.)

### A. Severance & Transfer of Wyoming Related Claims.

District courts possess broad discretion when evaluating whether to sever claims pursuant to Federal Rule of Civil Procedure 21. *Coleman*, 232 F.3d at 1297. Claims against different parties may be severed for trial or other proceedings if the court determines that the interests of justice would be better served by severance. *Initiative & Referendum Inst.*, 154 F. Supp.2d at 13. Severance should be denied where plaintiffs' allegations address a common series of transactions and occurrences that raise common questions of law and fact applicable to all defendants. *See United Mine Workers*, 383 U.S. at 724.

The Court previously has employed a balancing test in similar case to decide whether to keep claims together as pleaded or separate them by location. *WORC II*,

2021 WL 718857, at *6; *see also WORC I*, 2917 WL 374705, at *7. Under that test, a court should weigh "a plaintiff's choice of forum against the competing interest in 'having localized controversies decided at home.'" *Ctr. for Biological Diversity & Pac. Env't v. Kempthorne*, No. C–07–0894, 2007 WL 2023515, at *5 (N.D. Cal. July 12, 2007) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). "The Court again finds this balancing test helpful to determine whether to sever and transfer the [Wyoming] claims." *WORC II*, 2021 WL 718857, at *6.

A court typically affords great deference to a plaintiff's choice of forum. *See e.g., Lou*, 834 F.2d at 739; *Anderson*, 634 F. Supp. at 1204. "The Court previously determined in *WORC I* that the plaintiffs' forum choice deserved deference because BLM had approved the [two] RMPs through a single ROD, the Court maintained an interest in judicial economy to rule on identical claims relying on a similar record, and plaintiffs' held an interest in preventing the risk of inconsistent judgments." *WORC II*, 2021 WL 718857, at * 6 (citing *WORC I*, 2017 WL 374705, at *9).

By contrast, the BLM had approved two separate RODs in *WORC II*, yet the Court concluded that severance again proved inappropriate. *WORC II*, 2021 WL 718857, at * 6. The Court reasoned that "BLM's argument focuse[d] on formalistic administrative distinctions, but fail[ed] to address the broader context in which the claims arose." *Id*. The Court determined that the risk of inconsistent judgments and judicial economy counseled against severance because the plaintiffs "allege[d]

23

identical NEPA flaws regarding the two RMPAs and their respective 'mirror' SEISs." *Id*. The Court concluded that "[t]he claims involve[d] common questions of law because each SEIS allegedly suffers from identical flaws rooted in the same NEPA obligations and this Court's previous orders" in related cases. *Id*. The Court also expressed concern that severance could lead to "inconsistent judgments [that] could create disparate outcomes on either side of the state border in an ecologically and geographically contiguous region." *Id*. at *7.

The Court recognizes that this case has many similarities to the *WORC* cases. BLM issued six separate RMPAs and RODs to cover nine states (Doc. 25 at 9, n.7.) BLM used the same FEIS and employed a range-wide management approach that demonstrates regional planning. The sage-grouse habitat across the American West is also largely ecologically and geographically continuous despite the state borders. The Court recognizes that other courts have concluded otherwise with slightly different factual presentations.

*WildEarth Guardians v. Jewell (WildEarth Guardians I)*, No. 1:15-CV-2026-WJM, 2016 WL 8577508, at *5 (D. Colo. June 17, 2016), concluded that severance proved appropriate even though the plaintiffs challenged a "pattern and practice" of NEPA violations, because the plaintiffs challenged separate Mining Plan approvals that each had separate administrative records and significant factual differences. *See also WildEarth Guardians v. United States Off. of Surface Mining Reclamation &*

24

*Enf't (WildEarth Guardians II)*, No. 1:13-CV-00518, 2014 WL 503635 (D. Colo. Feb. 7, 2014) (similar conclusion). The Court concludes that this case proves more similar to *WORC I* and *WORC II* than to *WildEarth Guardians I* and *WildEarth Guardians II* as it pertains to Plaintiffs' choice of forum. The administrative record would be identical for each of the claims in this case. The factual differences appear minimal compared to the approval of entirely different mines in different locations addressed in *WildEarth Guardians I* and *WildEarth Guardians II*. Plaintiffs also challenge a pattern and practice of NEPA violations, yet this pattern and practice remains rooted in factual similarities, the same draft plan amendment, the same FEIS, and shared analysis.

The Court next considers the interest in having localized controversies decided at home. *WORC II*, 2021 WL 718857, at * 7; *see also Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). The Court recognizes that Wyoming has a strong interest in having its localized controversies decided at home. Wyoming contains a significant amount of sage-grouse habitat and for years actively has engaged in sage-grouse conservation efforts. The Wyoming ROD/RMPA represents a collaborative effort between BLM and Wyoming to protect sage-grouse, in addition to recognizing other priorities. Wyoming relies heavily on the oil and gas industry and greatly prioritizes mineral extraction across the state. The 2015 and 2025 Plans include specific distinctions among all states and

25

particularly in Wyoming.

A court typically affords great deference to a plaintiff's choice of forum, particularly if the plaintiff is at home in the forum. *See e.g.*, *Lou*, 834 F.2d at 739; *Anderson*, 634 F. Supp. at 1204; *see Seymour v. Contreraz*, CV-22-73-GF-BMM, 2022 WL 22899890, at *3 (D. Mont. Nov. 2, 2022) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("The plaintiff's choice deserves even 'greater deference' when he has chosen his home forum, which is presumed to be convenient."). Those interests may be outweighed by the interest in having localized controversies decided at home. The Court sees great benefit in local controversies being decided in the communities that experience those controversies. This factor may be dispositive in many scenarios.

The Court determined in *WORC I* that the single ROD at issue, judicial economy, and the plaintiffs' interest in consistent judgments tilted "slightly in favor of keeping the claims together." *WORC I*, 2017 WL 374705, at *10. The Court decided similarly in *WORC II* reasoning that the "[p]laintiffs' elevated interest in prevention of inconsistent judgments and judicial economy rooted in the unique background of th[e] case outweigh[ed] the interest in having localized controversies decided at home." *WORC II*, 2021 WL 718857, at * 7. The Court finds it similarly challenging to assess the proper balance in this case as it did in *MWF*.

The Court finds compelling Plaintiffs' focus on the risk of inconsistent

judgments and the inconvenience of piecemeal litigation. (Doc. 30 at 24-27.) The Court agrees that severance and transfer likely could result in conflicting decisions which would benefit no party and particularly not Federal Defendants. The Court recognizes that severance and transfer of the Wyoming case could create a snowball effect that would result in at least six separate cases in different states. The Court remains concerned that "[t]ransferring [the Wyoming claims and potentially] these cases to various States would require [P]laintiffs to make duplicative arguments and courts to render duplicative – and perhaps conflicting – decisions." *W. Watersheds Project v. Schneider*, No. 1:16-CV-83-BLW, 2019 WL 3877281, at *2 (D. Idaho Aug. 16, 2019). The Court does not see how this outcome would benefit judicial economy, the convenience of the parties, or serve justice.

The Court recognizes Wyoming's strong interests. Wyoming provides no authority, however, supporting the contention that its interests in oil and gas extraction should outweigh Plaintiffs' choice of forum. The Court recognizes the many distinctions between the plans based on state-specific conditions. Wyoming provides no evidence that such distinctions were not present in other RODs/RMPAs that courts declined to sever. The Court further agrees with Plaintiffs that their challenges primarily allege "common errors that Federal Defendants made with respect to all the challenged RMPAs." (Doc. 30 at 29.) The Court concludes that local interests do not justify severance and transfer where "Plaintiffs allege that the

27

challenged Plans suffer from common failings that did not result entirely from errors of local Field Offices." (*Id.*, *Schneider*, 2019 WL 3877281, at *2.)

The Court remains concerned about the risk of inconsistent judgments based on the shared procedural history, shared FEIS, and the many shared analyses and decisions throughout the various RODs/RMPAs. The Court will exercise its broad discretion to deny the motion to sever and transfer claims relating to the Wyoming ROD/RMPA.

### B. Transfer of Case.

Federal Defendants alternatively seek to transfer the entire case to the District of Wyoming. (Doc. 25 at 18.) Section 28 U.S.C. § 1404(a) governs discretionary changes of venue: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

A district court's consideration of a transfer pursuant to § 1404(a) involves two steps. *Montana Wildlife Fed'n v. Zinke*, No. CV-18-69-GF-BMM, 2018 WL 5810502, at *4 (D. Mont. Nov. 6, 2018). A district court first must decide whether the action originally could have been brought in the proposed transferee districts. *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). If the answer is yes, then the district court must make an individualized, case-specific analysis of convenience and fairness to the parties and witnesses, and an assessment of the

interests of justice. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

This assessment incorporates the following factors: (1) the convenience of the parties and witnesses; (2) familiarity of each forum with the applicable law; (3) the plaintiffs' choice of forum; (4) contacts of the different parties with the forum; (5) local interest in the controversy; (6) the ease of access to sources of proof and evidence; and (7) relative congestion in each forum. *Id*. The Court recognizes that venue likely would have proved proper in Wyoming as well. The Court declines to affirmatively conclude such a result but will address the remaining balancing factors.

The moving party bears the burden to establish why the forum should be changed. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co.*, 805 F.2d at 843. When a transfer "would only shift the inconvenience from defendant to plaintiff, the motion to transfer should be denied." *Anderson*, 634 F.Supp. at 1204. "[A] transfer is not available to a forum which is equally convenient or inconvenient to the original forum." *Id.*

Where venue is proper, "a plaintiff's choice of forum should rarely be disturbed." *Anderson*, 634 F. Supp. at 1204. A plaintiff need not choose the "best" forum. *WORC II*, 2021 WL 718857, at *3. The Court disagrees with Federal

Defendants that this "forum lacks a significant connection to the activities alleged in the complaint" just because more acreage of sage-grouse habitat exists in Wyoming compared to Montana. (Doc. 25 at 29-30, quoting *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001).) BLM manages millions of acres of sage-grouse habitat in Montana. (Doc. 39 at 6.) Such a connection proves far from "attenuated" or "tenuous." (Doc. 39 at 7, quoting *Williams*, 157 F. Supp. 2d at 1106; *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1158 (S.D. Cal. Mar. 21, 2005) (quoting *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 67 (D.D.C. 2003)).) Any proposed district would contain only a percentage of the sage-grouse habitat that BLM manages. The Court also disagrees with Federal Defendants' contentions that Plaintiffs' connection to Montana proves insignificant. (Doc. 25 at 30.) Plaintiff Gallatin Wildlife Association is headquartered and at home in Montana, and several other Plaintiffs have offices, staff, and chapters in Montana. Such a connection proves sufficiently significant and clearly more than tenuous. Federal Defendants further provide no evidence of inconvenience to them if the case remains in Montana.

Courts further routinely decline to credit defendants' arguments that the comparable percentage of a species in respective districts matters to a § 1404(a) analysis in discounting a plaintiff's choice of forum in ESA cases. *See Sierra Forest Legacy v. U.S. Fish & Wildlife Serv.*, No. 20-CV-05800-BLF, 2021 WL 2354852, at *5 (N.D. Cal. June 9, 2021). *Sierra Forest Legacy* explicitly rejected the

defendant's contention that courts consider the percentage of species found in the competing districts to discount a plaintiff's choice of forum. *Id*. (discussing analysis in *Bay.org v. Zinke*, No. 17-CV-03739-YGR, 2017 WL 3727467, at *4 (N.D. Cal. Aug. 30, 2017).) Federal Defendants fail to meet their burden as to this factor.

Federal Defendants additionally argue that Wyoming and other local entities have an interest in having local issues resolved in a home forum. (Doc. 31 at 5.) Federal Defendants asserts that Wyoming's interests "far outweigh the similar interests State of Montana and its citizenry." (*Id*.) Federal Defendants cite the increased acreage of sage-grouse habitat in Wyoming and Wyoming's oil and gas interests as reasons for that imbalance. (*Id*.) The Court finds unpersuasive Federal Defendants' arguments.

The Court recognizes that the relative percentage of the species in the competing districts represents a factor that may be considered when weighing local interests in ESA cases. *Sierra Forest Legacy*, 2021 WL 2354852, at *6. The Court recognizes that Wyoming has strong interests. Wyoming's strong interests cannot easily be valued over those of Montana. No authority suggests how a court should weigh these competing interests. The Court determines that Federal Defendants fail to demonstrate Wyoming's local interests exponentially outweigh Montana's interests, particularly when considering the great deference granted to a plaintiff's choice of forum.

Many courts have granted transfer where all the land, or relevant matter of dispute, lies in the other district. *See e.g.*, *Ctr. for Env't L. & Pol'y*, 2009 WL 10668581, at *4 (granting transfer when dam was located entirely in Eastern District of Washington and plaintiff's only purported reason to be in the Western District of Washington was for convenience of counsel); *Native Vill. of Point Hope v. U.S. E.P.A.*, No. C11-667 MJP, 2011 WL 4395717, at *1 (W.D. Wash. Sept. 21, 2011) (granting transfer when plaintiffs challenged water quality standards of creek located exclusively in Alaska); *W. Watersheds Project v. Nat'l Park Serv.*, No. 1:21-CV-00219-DCN, 2021 WL 5828028, at *3 (D. Idaho Dec. 8, 2021) (granting transfer where challenges involved livestock grazing and associated infrastructure in four units of the National Park System exclusively located in Utah and Colorado); *but see Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. CIV. 10-1129-AC, 2011 WL 1527598, at *8 (D. Or. Apr. 20, 2011) (denying transfer when issue involved mining plan located in other district but the complaint challenged meetings held in violation of federal law in District of Oregon). This case substantially differs from these examples as a significant portion of the sage-grouse and sage-grouse habitat lies in Montana, rather than being located exclusively in Wyoming.

Federal Defendants further argue that judicial economy favors hearing this case jointly with *WEA* in the District of Wyoming. (Doc. 25 at 19-21.) The Court will discuss this case when it addresses the first-to-file analysis. Federal Defendants

32

suggest that convenience of the parties and witnesses does not represent significant factor in an APA case such as this one. (Doc. 25 at 31.) The Court acknowledges Federal Defendants' assertions and generally agrees. Federal Defendants argue that transfer would relieve court congestion as Wyoming is less congested than the District of Montana. (*Id*. at 28-29.) The Court agrees with Plaintiffs that Federal Defendants' arguments proves unpersuasive. The relative court congestion is not so stark as to prove significant. Federal Defendants focus only on the number of cases filed in each district without acknowledging that Montana also has more Article III judges to handle the larger case load.

The Court notes that no significant case history exists in the District of Wyoming that would counsel transfer, and rather, the most relevant case history occurred in the District of Montana. In *Pit River Tribe v. Bureau of Land Mgmt.*, No. 19-CV-02002-PJH, 2019 WL 6341566, at *6 (N.D. Cal. Nov. 27, 2019), the court determined that transfer proved appropriate based largely on the fact that the previous iterations of the *Pit River* cases—which challenged lease sales—had occurred in the other district. Courts have considered the relative experience of a judge or district in specific case histories when analyzing judicial efficiency. *See Bay.org*, 2017 WL 3727467, at *5 (concluding that the other judge had "gained not only factual and technical knowledge" of the issues as the judge already had presided over related matters for several years which weighed in favor of judicial efficiency).

33

"In the usual case, unless the balance of the § 1404(a) factors weighs heavily in favor of the defendants, 'the plaintiff's choice of forum should rarely be disturbed.'" *Kempthorne*, 2007 WL 2023515, at \*3 (quoting *Securities Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir.1985)). For the reasons discussed above, the Court declines to transfer the case, or segments of the case, to the District of Wyoming pursuant to § 1404(a).

### C. First-to-File Rule.

The first-to-file doctrine permits a district court to transfer, stay, or dismiss an action when a similar complaint already has been filed in another district. *Pacesetter Systems Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982); *Kohn Law Group, Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015). The first-to-file rule "is designed to avoid placing an unnecessary burden on the federal judiciary, and avoid the embarrassment of conflicting judgments." *Church of Scientology of Cal. v. U.S. Dep't of Army,* 611 F.2d 738, 750 (9th Cir. 1979), *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Although discretionary, the first-to-file rule "is intended to 'serve[ ] the purpose of promoting judicial efficiency well and should not be disregarded lightly." *Kohn*, 787 F.3d at 1239 (quoting *Church of Scientology*, 611 F.2d at 750).

Courts consider three factors in determining whether the first-to-file rule

applies: (1) the chronology of the lawsuits; (2) the similarity of the parties; and (3) the similarity of the issues. *Kohn*, 787 F.3d at 1240. The first-to-file rule is not "a rigid or inflexible rule to be mechanically applied." *Pacesetter*, 678 F.2d at 95. The Ninth Circuit has recognized three exceptions to the rule: bad faith, anticipatory lawsuit, and forum shopping. *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991). Where the earlier filed action has not advanced, the equities may weigh in favor of an exception to the first-to-file rule. *See Adoma v. Univ. of Phoenix*, 711 F.Supp.2d 1142, 1150 (E.D. Cal. 2010); *see also Church of Scientology*, 611 F.2d at 750.

WEA filed its action on December 23, 2025, only one day after BLM published the final 2025 Plans. *See Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), Dkt. No. 1. Plaintiffs filed the complaint in this case on March 2, 2026. (Doc. 1.) Nothing happened in *WEA* until March 10, 2026, when WEA amended the complaint to add Wyoming as a plaintiff. *See Amended Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), Dkt. No. 6. Nothing else has happened in the *WEA* docket beyond issuance of summonses, pro hac vice orders, and the filing of the administrative record on July 13, 2026. *See NOTICE*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. July 13, 2026), Dkt. No. 23.

"[E]xact identity of parties is not required," however, "this action involves substantially different parties than the [WEA] action." *Montana Env't Info. Ctr. v.*

*Bernhardt*, No. CV-19-130-SPW, 2020 WL 4346604, at \*3 (D. Mont. July 29, 2020); *see also Kohn*, 787 F.3d at 1240. None of the Plaintiffs in this case are parties in the *WEA* action. "The issues in both cases also need not be identical, only substantially similar." *Kohn*, 787 F.3d at 1240. To determine whether the issues are substantially similar, courts "look at whether there is 'substantial overlap' between the two suits." *Id.* at 1241.

Courts have determined that the first-to-file rule may not apply where the second-filed action is broader than the first action. *See e.g., Montana Merchandising, Inc. v. Dave's Killer Bread, Inc.*, 2017 WL 2536530, \*5 (D. Mont. June 9, 2017) (declining to apply the first-to-file rule where second-filed action included "additional plaintiffs, defendants, and claims" and the claims extended "beyond the scope of the claims of the [first-filed] case"); *Roller Bearing Co. of Am., Inc. v. American Software, Inc.*, 570 F.Supp.2d 376, 388 (D. Conn. 2008) (finding judicial economy was best served by allowing the much broader second-filed action to proceed). The Court recognizes that both suits relate to the same federal agency decisions. The Court also acknowledges that the suits include different challenges, under varying statutes, that seek the opposite relief. The Court remains skeptical about whether the two cases prove substantially similar for the purposes of the first-to-file rule.

The Court remains further troubled by application to this case of the Ninth

36

Circuit's recognized exceptions to the first-to-file rule, including bad faith, anticipatory lawsuit, and forum shopping. *Alltrade, Inc.*, 946 F.2d at 628. A lack of "adverse legal interests" between the first-filed friendly party and the agency represents one of the issues that fall into those buckets. *Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 636 (9th Cir. 2014). The Ninth Circuit in *Shell Gulf of Mexico* concluded that Shell and the Bureau of Safety and Environmental Enforcement (the "Bureau") lacked "adverse legal interests" because Shell was not "aggrieved" by the Bureau. *Id*. at 636. The Ninth Circuit reasoned that declaratory judgment actions address adverse legal interests which require that a person has been aggrieved by agency action. *Id*.

Shell had filed suit under the Administrative Procedure Act ("APA") seeking a declaration that the Bureau's approval of its oil spill response plans did not violate the APA. *Id*. at 634. "Shell claimed that it needed a swift determination of the legality of the approval so it could conduct exploratory drilling without worrying that the environmental groups would seek to overturn the Bureau's approval of the spill response plans." *Id*. The Ninth Circuit characterized Shell's lawsuit as "a novel litigation strategy, whereby the beneficiary of agency action seeks to confirm its lawfulness by suing those who it believes are likely to challenge it." *Id*. The Ninth Circuit concluded this strategy "[ran] afoul of Article III's case or controversy requirement." *Id*.

37

WEA's suit explicitly notes that it "seeks a declaratory judgment from this court under 28 U.S.C. § 2201 holding that BLM complied with its statutory and regulatory obligations under the Federal Land Policy and Management Act (FLPMA) to ensure that the 2025 Record of Decision (ROD) and Approved Resource Management Plan Amendment (ARMPA) for Wyoming was 'consistent with State and local plans to the maximum extent [the Secretary] finds consistent with Federal law and the purposes of [FLPMA].'" *See Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), Dkt. No. 1, ¶ 2. (citing 43 U.S.C. § 1712(c)(9).) Wyoming's motion to dismiss states only that the WEA "complaint seeks a declaratory judgment that BLM complied with the requirement of FLPMA to ensure consistency with state plans 'to the maximum extent [the secretary] finds consistent with Federal law and the purposes of the act,'" 43 U.S.C. § 1712(c)(9)." (Doc. 25 at 13.)

The *WEA* Amended Complaint states that "[t]he State of Wyoming seeks a declaratory judgment to clarify its rights and obligations concerning two provisions that may conflict with the State's sage-grouse executive order, depending on how they are interpreted. The State seeks a declaration that the State's Density Disturbance Calculation Tool (DDCT) represents the only appropriate tool for measuring disturbance in Wyoming. Furthermore, if a contradiction exists 'between the Bureau's project-level analysis for HAF-fine scale and project-level DDCT, the

project-level DDCT will control.'" *See Amended Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), Dkt. No. 6, ¶ 3. The Court recognizes that Wyoming's claim does not present as straightforwardly friendly as the claim in *Shell Gulf of Mexico*. The Court also agrees with Plaintiffs that Wyoming's complaint fails to allege a definite adverse interest as its challenge remains qualified by the concession that conflict may exist only "depending on how [the provisions] are interpreted." *Id*.

The Ninth Circuit in *Shell Gulf of Mexico* stated that "[l]awsuits affect a vast range of persons, and an Article III case or controversy does not exist wherever an individual possibly, probably, or even certainly affected by litigation asks a federal court to resolve a legal question. Thus, it is not enough for a declaratory judgment plaintiff to assert, as Shell does here, a practical interest in the outcome of a lawsuit between other parties. Instead, Article III requires the existence of adverse legal interests arising from a legal claim, and that is absent from this case." 771 F.3d. at 637. The Court finds compelling this guidance.

Courts are similarly wary of anticipatory filing. *See Z-Line Designs, Inc. v. Bell'O Int'l, LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003). The fact that WEA filed this suit only one day after BLM had published the final rule, and within the context of an extensive history of litigation over agency decisions on sage-grouse, suggests that WEA filed the action in the District of Wyoming in anticipation of future suits

in other Districts. The *WEA* Amended Complaint clearly states the suit seeks to "resolve longstanding and ongoing legal and regulatory uncertainty" which appears to be a concession that the suit was anticipatorily filed. *See Amended Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), Dkt. No. 6, ¶ 16. "Such anticipatory suits are disfavored because they are examples of forum shopping." *Z-Line Designs*, 218 F.R.D. at 665 (quoting *Alaris Med. Sys. v. Filtertek, Inc.,* 64 U.S.P.Q.2d 1955 (S.D. Cal. 2001) (citing *Mission Ins. Co. v. Puritan Fashions Corp.,* 706 F.2d 599, 602 n. 3 (5th Cir. 1983))). The Court remains skeptical of this seeming attempt to deprive future plaintiffs of their conventional choice of forum and timing. *Z-Line Designs*, 218 F.R.D. at 665 (internal citation omitted).

The Court determines that transfer based on the first-to-file rule would be inappropriate in this case. The Court recognizes that Federal Defendants accuse Plaintiffs of similar gamesmanship. (Doc. 39 at 3-6.) The Court finds that insufficient evidence exists to prove Plaintiffs are forum shopping. (Doc. 39 at 7-8.) The Court finds such accusations particularly unpersuasive when much of the procedural history of the sage-grouse litigation has occurred in the District of Montana, the new litigation involves a different consortium of plaintiffs, and at least one plaintiff is at home in Montana.

**IT IS ORDERED** that the State of Wyoming's Motion to Dismiss or, in the Alternative, to Sever and Transfer (Doc. 21) is **DENIED**.

**IT IS FURTHER ORDERED** that Federal Defendants' Motion to Transfer (Doc. 24) is **DENIED**.

DATED this 29th day of July, 2026.

Brian Morris, Chief District Judge
United States District Court